Opinions of the United States Court of Appeals for the Third Circuit



5-14-1999

# Anker Energy Corp v. Consol Coal Co

Precedential or Non-Precedential:

Docket 98-3451

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"Anker Energy Corp v. Consol Coal Co" (1999). *1999 Decisions.* Paper 128.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/128

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed May 14, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 98-3451

ANKER ENERGY CORPORATION, AND KING
KNOB COAL COMPANY, INC.,

     Appellants

v.

CONSOLIDATION COAL COMPANY; UNITED MINE
WORKERS OF AMERICA COMBINED BENEFIT FUND;
MARTY D. HUDSON, TRUSTEE; MICHAEL H. HOLLAND,
TRUSTEE; THOMAS O.S. RAND, TRUSTEE; ELLIOTT A.
SEGAL, TRUSTEE; CARLTON R. SICKLES, TRUSTEE;
GAIL R. WILENSKY, TRUSTEE; WILLIAM P. HOBGOOD,
TRUSTEE; KENNETH S. APFEL, COMMISSIONER OF THE
SOCIAL SECURITY ADMINISTRATION*

On Appeal from the United States District Court
for the Western District of Pennsylvania
District Judge: Honorable William L. Standish
(D.C. Civ. No. 96-01938)

Argued March 25, 1999

BEFORE: GREENBERG, ROTH, and ROSENN,
Circuit Judges

(Filed: May 14, 1999)

_____

*Kenneth F. Apfel is substituted as a defendant for Shirley Sears Chater
as Commissioner, pursuant to Fed. R. Civ. P. 25(d) (i) and Fed. R. App.
P. 43(c).

Paul A. Manion (argued)
Robert D. Finkel
Manion McDonough & Lucas
600 Grant Street, Suite 882
Pittsburgh, PA 15219

Charles L. Woody
Paula Durst Gillis
Spilman Thomas & Battle
P.O. Box 273
Charleston, WV 25321-0273

James A. Walls
General Counsel
Anker Energy Corporation
2708 Cranberry Square
Morgantown, WV 26505

Attorneys for Appellants

Edwin J. Strassburger (argued)
David A. Strassburger
Strassburger McKenna Gutnick
& Potter
322 Boulevard of the Allies,
Suite 700
Pittsburgh, PA 15222

Robert M. Vukas
General Counsel
Consol, Inc.
Consol Plaza
1800 Washington Road
Pittsburgh, PA 15241-1421

Attorneys for Appellee
Consolidation Coal Company

Peter Buscemi (argued)
Morgan, Lewis & Bockius
1800 M Street, N.W.
Washington, DC 20036

2

John R. Mooney
Elizabeth A. Saindon
Mark J. Murphy
Mooney, Green, Baker, Gibson,
and Saindon
700 14th Street, N.W., Suite 1100
Washington, DC 20005

David W. Allen
Christopher Clarke
Office of the General Counsel
UMWA Health and Retirement
 Funds
4455 Connecticut Avenue, N.W.
Washington, DC 20008

 Attorneys for Appellees
 UMWA Combined Benefit Fund and
 Its Trustees

Frank W. Hunger
Assistant Attorney General
Harry Litman
United States Attorney
Douglas N. Letter
Edward R. Cohen (argued)
Attorneys, Appellate Staff
Civil Division, Room 9014
U.S. Department of Justice
601 D Street, N.W.
Washington, DC 20530

Frieda S. Colfelt
Department of Health and Human
 Services
Office of General Counsel
6401 Security Boulevard
Altmeyer Building
Baltimore, MD 21235

 Attorneys for Appellee
 Commissioner of Social Security

3

OPINION OF THE COURT

GREENBERG, Circuit Judge.

I. INTRODUCTION

In 1992, Congress enacted the Coal Industry Retiree Health Benefits Act ("Coal Act"), 26 U.S.C.S 9701-9722, to ensure that retired coal miners and their dependents would continue to receive the health and death benefits they had been receiving since the 1940s pursuant to a series of collective bargaining agreements. By the late 1980s, problems had arisen that caused serious under-funding to the two benefit plans funding the miners' benefits. Fearing that the miners and their families would be left with no health or death benefits, Congress stepped in and passed the Coal Act, which provided a new funding mechanism under which the Commissioner of Social Security ("Commissioner") would assign miners to a coal industry employer based on the recency and longevity of a miner's employment. That employer then would be responsible for providing the funds for those miners' benefits.

The Coal Act has led to a flood of litigation challenging the Commissioner's assignments of liability under the Act, as well as Takings and Due Process challenges to the constitutional validity of the Act's imposition of retroactive liability. Following this legal trend, Anker Energy Corp. ("Anker") filed this action in the United States District Court for the Western District of Pennsylvania seeking declaratory and injunctive relief that the Commissioner improperly assigned it responsibility for funding certain miners' benefits and that these assignments violated the Takings and Due Process Clauses of the Fifth Amendment to the United States Constitution. Anker also asserted that appellee Consolidation Coal Co. ("Consol") had agreed to assume liability for any payments due for miners' benefits and to reimburse Anker for any such payments Anker made, and thus was liable to it for the monies attributable to the assignments.

4

The district court dismissed all of these claims at the pleadings and summary judgment stages of litigation. First, the court granted Consol's motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c) on Anker's claims that the Commissioner should have assigned the miners to Consol, and that Consol had agreed to indemnify Anker for any liability it incurred for the payment of miners' benefits. See Anker Energy Corp. v. Consolidation Coal Co., Civ. No. 96-1938 (W.D. Pa. July 25, 1997) (Anker I). Subsequently, the district court upheld the constitutionality of the application of the Coal Act to Anker on a motion for summary judgment. See Anker Energy Corp. v. Consolidation Coal Co., Civ. No. 96-1938 (W.D. Pa. Mar. 11, 1998) (Anker II). Finally, inasmuch as it had affirmed the imposition of liability against Anker and had determined that Anker was delinquent in its payments under the Act, the district court entered a judgment of $1,180,489.06 against Anker for annual premiums, interest, liquidated damages, attorney's fees, and costs. See Anker Energy Corp. v. Consolidation Coal Co., Civ. No. 96-1938 (W.D. Pa. July 21, 1998) (Anker III). This appeal followed.

## II. FACTUAL AND PROCEDURAL HISTORY

### A. Factual History

The courts have well-chronicled the history of the coal industry's struggles to provide retirement and health benefits to miners. See, e.g., Unity Real Estate Co. v. Hudson, ___ F.3d ___, 1999 WL 167765, at *2-*4 (3d Cir. Mar. 29, 1999); Eastern Enters. v. Apfel, 524 U.S. 498, ___, 118 S.Ct. 2131, 2137-42 (1998) (plurality opinion). Therefore, we only briefly will summarize this chronology and outline the parties' roles within that larger story.

In 1947, the United Mine Workers of America ("UMWA") and the Bituminous Coal Operators' Association ("BCOA") agreed upon the first of a series of National Bituminous Wage Agreements ("NBCWA" or "wage agreement"), which specified the terms and conditions of employment and provided health and pension benefits for miners. The 1947 NBCWA established the United Mine Workers of America Welfare and Retirement Fund, which used the proceeds of

a royalty on coal production to provide pension and medical benefits for miners and their families. The 1947 NBCWA did not specify the benefits to which miners and their families were entitled, instead leaving this task to three trustees in charge of the Fund. In 1950 the union and the industry association agreed upon a new NBCWA that created a new Fund financed by a per ton levy on coal mined by signatory operators. Like the 1947 Fund, the 1950 version did not promise specific benefits, and the benefits were always subject to cancellation or change.

This system did not change significantly until 1974 when, to comply with the newly enacted ERISA, the UMWA and the BCOA negotiated a new wage agreement that created four trusts funded by royalties on coal production and premiums based on hours worked by miners. Under the new agreement, the 1950 Benefit Plan covered miners who retired before January 1, 1976, and their dependents, while the 1974 Benefit Plan covered miners who retired after 1975 and their dependents. Both Plans provided non-pension benefits, including medical benefits.

The 1974 NBCWA explained that it was amending the previous system to provide health benefits for retired miners "for life," and to their widows until death or remarriage. Because of this broadened coverage the number of eligible benefit recipients increased dramatically, and the Plans began losing money.

In response, the 1978 NBCWA assigned responsibility to signatory employers for the health care of their own active and retired employees. The 1978 agreement also restricted the 1974 Plan so that it would provide health benefits only for "orphaned" retirees, those whose last employer had gone out of business or otherwise ceased contributing to the Plans. To ensure the Plans' solvency, the 1978 NBCWA included a "guarantee" clause that obligated signatories to make sufficient contributions to maintain benefits during that agreement, and the union and operators amended the Plans to include "evergreen clauses" that required signatories to contribute to the Plans if they remained in the coal business even if they never signed another wage agreement.

Despite the 1978 NBCWA and subsequent attempts to improve the Plans, they continued to lose money because of the increase in beneficiaries, the escalating costs of health care, and the flood of signatory companies abandoning the Plans. In 1992 Congress responded by passing the Coal Act. The Act merged the 1950 and 1974 Benefit Plans into a new multi-employer plan called the United Mine Workers of America Combined Benefit Fund ("Combined Fund"). The Combined Fund provides "substantially the same" health benefits to retirees and their dependents that the 1950 and 1974 Plans provided. 26 U.S.C. S 9703(b)(1), (f). However, Congress altered the funding mechanism, an action that has led to the overflow of litigation.

The Act finances the Combined Fund with annual premiums assessed against signatory operators, which are companies that were or are signatories to a "coal wage agreement." 26 U.S.C. S 9701(c)(1). The Act defines a "coal wage agreement" as an NBCWA, or "any other agreement entered into between an employer in the coal industry and the United Mine Workers of America that required" the provision of health benefits to its retirees or contributions to the 1950, 1974 or any prior Benefit Plan. 26 U.S.C. S 9701(b)(1)(A), (B). Any signatory operator who "conducts or derives revenue from any business activity, whether or not in the coal industry," may be required to contribute to the Combined Fund. 26 U.S.C. SS 9701(c)(7), 9706(a). Where a signatory operator is no longer involved in any business activity, premiums may be assessed against "related person[s]" including "successors in interest and businesses or corporations under common control." Eastern Enters., 524 U.S. at ___, 118 S.Ct. at 2142 (discussing 26 U.S.C. SS 9701(c)(2)(A), 9706(a)).

The Commissioner of Social Security assigns retirees to particular signatory operators, and calculates premiums according to these assignments based on the following formula:

> (a) In general. -- For purposes of this chapter, the Commissioner of Social Security shall . . . assign each coal industry retiree who is an eligible beneficiary to a signatory operator which (or any related person with

7

respect to which) remains in business in the following order:

(1) First, to the signatory operator which --

  (A) was a signatory to the 1978 coal wage agreement or any subsequent coal wage agreement, and

  (B) was the most recent signatory operator to employ the coal industry retiree in the coal industry for at least 2 years.

(2) Second, if the retiree is not assigned under paragraph (1), to the signatory operator which --

  (A) was a signatory to the 1978 coal wage agreement or any subsequent coal wage agreement, and

  (B) was the most recent signatory operator to employ the coal industry retiree in the coal industry.

(3) Third, if the retiree is not assigned under paragraph (1) or (2), to the signatory operator which employed the coal industry retiree in the coal industry for a longer period of time than any other signatory operator prior to the effective date of the 1978 coal wage agreement.

26 U.S.C. S 9706(a).

The surge of litigation attacking the Coal Act began shortly after the Commissioner began assigning retirees to signatory operators. In Lindsey Coal Mining Co. v. Chater, 90 F.3d 688 (3d Cir. 1996), we held the Act constitutional as applied to a coal company to which the Commissioner had assigned retirees through section 9706(a)(3) concerning those signatory operators who had not signed the 1978 agreement. See id. at 695. However, the Supreme Court's decision in Eastern Enterprises, 524 U.S. 498, 118 S.Ct. 2131, calls the continuing vitality of Lindsey Coal Mining into question, as the Court found the Act unconstitutional as applied to a coal company that had ceased mining in 1965 and never signed the 1974 or subsequent wage

8

agreements. Id. at 2153 (plurality opinion); id. at 2154 (Kennedy, J., concurring in judgment).

We recently have had the opportunity to apply the fragmented Eastern Enterprises decision to facts similar to those here. In Unity Real Estate, 1999 WL 167765, we upheld the Commissioner's assessment of liability against two companies that had signed the 1974 and 1978 wage agreements and later NBCWAs as constitutional in the face of takings and due process challenges. Id. at *25, *29.

B. Procedural History

The seeds of discontent that led to this suit were sown on March 30, 1994, when the Commissioner informed Anker that she was assigning it liability for certain retired miners, surviving spouses and dependents, and several orphaned miners due to its relationship with King Knob Coal Co. ("King Knob") which no longer was in business. From 1967 until 1982, Consol had contracted with King Knob for it to extract coal on certain of Consol's properties. As part of these contracts, King Knob agreed that "its employees shall be members of the United Mine Workers of America and it shall be a signatory to the then current National Bituminous Coal Wage Agreement." App. at 75.

To achieve this end, King Knob signed "me too" agreements during the 1970s and 1980s, the last in 1984. See app. at 8. Anker characterizes a "me too" agreement as an agreement between an employer who was not a member of the BCOA nor an NBCWA signatory yet who agreed by separate instrument with the UMWA to "be bound by the terms of the NBCWAs." App. at 8.

An affiliate of Anker acquired King Knob in 1975. The parties' relationship continued uneventfully until Consol canceled its contracts with King Knob following which they entered into a settlement agreement on July 23, 1982. Paragraph 4(b) of the settlement required Consol to

> promptly reimburse King Knob for all subsequent
> payments due to the UMWA Fund or any successor
> fund attributable to (i) tonnage of coal produced under
> the contracts, (ii) hours worked at the mine operated
> under the Robinson Run contract on or before August

9

> 31, 1982, and (iii) hours worked at the mines operated under the Booth contract on or before June 30, 1982.

App. at 17, 97.

In 1994 and 1995, the Commissioner informed Anker that it was a related person to King Knob and was being assigned liability for a number of beneficiaries under the Coal Act. Arguing that Consol was the proper signatory operator responsible for some of these retirees under the Act as they worked at Consol's properties and Consol was responsible for them, Anker protested this assignment. The Commissioner responded that Anker's liability was based upon the fact that King Knob (not Consol) was the signatory employer of the eligible retirees. Moreover, the Commissioner determined that she was not authorized to assign Anker's premiums to Consol despite the parties' possible contractual agreement for reimbursement of future benefits because the Social Security Administration "is not bound by any private agreements made between companies, nor does the Coal Act allow for pro-ration of premium payments between companies." App. at 33.

Anker and King Knob responded by filing this action seeking declaratory and injunctive relief that Consol is liable for any premiums due the Combined Fund, and that the Commissioner's assessment of liability to the Combined Fund under the Coal Act violates the Due Process and Takings Clauses of the Fifth Amendment to the United States Constitution. As a matter of convenience we usually refer to Anker alone as the plaintiff and appellant. Besides Consol, Anker named the UMWA Combined Fund, its Trustees and the Commissioner as defendants.

In an unpublished disposition, the district court granted Consol's motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c) as to Counts One and Two of Anker's complaint. Anker I at 2. In Count One, Anker alleged that Consol had agreed with King Knob and the UMWA that it would pay the premiums owed to the 1950 and 1974 Plans based upon the amount of coal produced and the hours worked by King Knob's employees. Id. at 13. Anker contended that because of these agreements, Consol became the signatory operator responsible for King Knob's

10

employees' benefits under the 1950 and 1974 Plans, and thus was the proper party to which the Commissioner should assign King Knob's retirees. Id. at 14.

The district court held that Anker could not support this claim and granted Consol judgment as a matter of law on Count One. Id. The court recognized that "it is undisputed that King Knob was a signatory to one or more coal wage agreements covering its employees at Consol's Booth and Robinson Run properties, and that Anker is a `related person' to King Knob as defined in the Coal Act." Id. at 15. King Knob was also clearly the employer of the miners. Id. at 20. Thus, the Commissioner's assignment of beneficiaries and liability under the Act to Anker as a related person to King Knob was correct. Id. at 21. Moreover, the court refuted Anker's argument that Consol had agreed in 1982 to be responsible for any future contributions owed to a subsequent benefit plan, and agreed with the Commissioner that the Coal Act does not allow for the assessment of liability based upon private contracts. Id. at 15-16.

The court also granted Consol's motion for judgment on the pleadings on Count Two, which alleged that pursuant to their settlement agreement Consol was liable to Anker for all premiums for which Anker is responsible under the Act. Id. at 21. The court rejected Anker's argument that paragraph 4(b) of the settlement agreement bound Consol to reimburse King Knob, and thus Anker, for its liability under the Coal Act, reasoning that premiums under the Act are not

> `attributable to' the tonnage of coal produced and the number of hours worked under the contract mining agreements, and the Combined Fund is not a successor fund which requires premium payments based on the tonnage of coal produced or the number of hours worked by a signatory operator's employees. Rather, under the Coal Act, health benefits are funded by the imposition of what is, in essence, a tax.

Id. at 22-23. Finally, the court relied upon Carbon Fuel Co. v. USX Corp., 100 F.3d 1124 (4th Cir. 1996), when it held that even if Anker was entitled to reimbursement under its

11

contract with Consol, Consol still would be entitled to judgment as a matter of law because "the Coal Act abrogated pre-act contracts reallocating mining companies' obligations to pre-Act benefit plans." Id. at 24 n.17. Next the district court upheld the constitutionality of the application of the Coal Act to Anker in a second unpublished decision, and, relying upon our holding in Lindsey Coal Mining, 90 F.3d 688, granted summary judgment in favor of the Combined Fund, its Trustees, and the Commissioner on Count Three which sought a finding of unconstitutionality. Anker II at 6.

Finally, on July 21, 1998, the district court granted summary judgment on the Combined Fund's counterclaim for entry of a judgment against Anker and King Knob for annual premiums, interest, liquidated damages, attorney's fees, and costs. Anker III at 10-11. Anker did not contest the assessment of annual premiums. Id. at 6 n.3. Considering this fact and Congress's clear intent to provide for liquidated damages, interest, attorney's fees, and costs if an employer fails to make timely payments, the court entered judgment for $1,180,489.06 against Anker and King Knob in a third unpublished disposition. Id. at 11. Anker and King Knob then appealed.

III. DISCUSSION

Anker argues that the Coal Act is unconstitutional as applied to it according to the Supreme Court's decision in Eastern Enterprises, 524 U.S. 498, 118 S.Ct. 2131. Appellants' Brief at 19-26. Alternatively, Anker urges us to reverse the district court's grant of judgment on the pleadings against it on Counts One and Two of its complaint. Id. at 26-37. Anker repeats its position concerning Count One that the Commissioner should have assigned the miners at issue to Consol. As to Count Two, Anker contends that the district court erroneously found paragraph 4(b) of the settlement agreement between King Knob and Consol clear and unambiguous. Consequently, Anker believes that the district court erred in not considering its parol evidence, and that under our precedent, parol evidence is essential to interpreting the parties' intent correctly. Moreover, Anker argues that the

12

district court's interpretation of paragraph 4(b) of the settlement agreement was simply wrong. Id. at 28–37. Finally, Anker contests the district court's awarding the Combined Fund interest, liquidated damages, attorney's fees, and costs, arguing that the Act does not provide for the assessment of these items. Id. at 37–48.

We will affirm the district court's decisions regarding the constitutionality of the Act, the correctness of the Commissioner's assignments, and the award of interest, liquidated damages, fees and costs against Anker. However, we will reverse the court's order granting judgment on the pleadings on Count Two, Anker's contract claim for reimbursement from Consol, and will remand to the district court for further proceedings on that count.1

A. Standard of Review

In reviewing the district court's order, we examine the Commissioner's action under the same standard of review properly applied by the district court. See Florida Power & Light Co. v. Lorion, 470 U.S. 729, 744, 105 S.Ct. 1598, 1607 (1985). Thus, we review the Commissioner's decision as a final agency action brought under the Administrative Procedure Act. See Lindsey Coal Mining, 90 F.3d at 691; 5 U.S.C. S 704. Accordingly, the issue is whether the administrative determination was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. S 706(2)(A).2 See C.K. v. New Jersey Dep't of Health and Human Servs., 92 F.3d 172, 182 (3d Cir. 1996).

_____

1. The district court had federal question jurisdiction pursuant to 28 U.S.C. S 1331 because the case arises under the Constitution of the United States and the Coal Industry Retiree Health Benefits Act of 1992, 26 U.S.C. S 9701–9722, and had supplemental jurisdiction over Anker's breach of contract claim pursuant to 28 U.S.C. S 1367. We have jurisdiction pursuant to 28 U.S.C. S 1291.

2. The district court appears to have reviewed the Commissioner's decision de novo, as was also the case in Lindsey Coal Mining, 90 F.3d at 691 n.3. However, as we noted there, inasmuch as we "come to the same decision as the district court in affirming the Commissioner's decision, any application of a different standard of review on its part was
harmless." Id.

We review the district court's decision as to the constitutionality of the Coal Act as applied to Anker de novo. See Dyszel v. Marks, 6 F.3d 116, 123 (3d Cir. 1993). Similarly, our review of the district court's granting of judgment on the pleadings and summary judgment where the district court was not reviewing the Commissioner's decisions is plenary. See Smith v. National Collegiate Athletic Ass'n, 139 F.3d 180, 183 (3d Cir. 1998), rev'd on other grounds, 119 S.Ct. 924 (1999); Petruzzi's IGA Supermarkets, Inc. v. Darling–Delaware Co., 998 F.2d 1224, 1230 (3d Cir. 1993).

B. Takings and Due Process Challenges

Our discussion of Anker's constitutional challenge begins with Eastern Enterprises, 524 U.S. 498, 118 S.Ct. 2131, where a fragmented Supreme Court considered the constitutionality of the Coal Act as applied to a company whose coal operations had ceased in 1965. Id. at ___, 118 S.Ct. at 2143. A majority of the Court struck down the law as applied to Eastern Enterprises by relying on two distinct theories. The four-justice plurality held that application of the Coal Act to Eastern Enterprises violated the Fifth Amendment as an unconstitutional taking. Id. at ___, 118 S.Ct. at 2149. Justice Kennedy, who provided thefifth vote striking down the application of the Act, disagreed with the plurality's takings reasoning, but found that the Act's retroactivity violated due process. Id. at ___, 118 S.Ct. at 2154 (Kennedy, J., concurring in judgment and dissenting in part). The four dissenting justices agreed with Justice Kennedy that application of the statute did not violate the Takings Clause, yet disagreed with his opinion that the Act violated due process. Id. at ___, 118 S.Ct. at 2161 (Breyer, J., dissenting).

To consider Anker's takings and due process claims, we first must decide what, if any, holding in Eastern Enterprises binds our decision. "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, `the holding of the Court may be viewed as that position taken by those Members who concurred in the judgment on the narrowest grounds.' " Marks v. United States, 430 U.S. 188, 193, 97 S.Ct. 990, 993 (1977) (quoting Gregg v. Georgia, 428 U.S.

14

153, 169 n.15, 96 S.Ct. 2909, 2923 n.15 (1976)). However, as we recognized in Rappa v. New Castle County , 18 F.3d 1043 (3d Cir. 1994), and reaffirmed in Unity Real Estate, 1999 WL 167765, at *9, the Marks rule is applicable only where "one opinion can be meaningfully regarded as `narrower' than another" and can "represent a common denominator of the Court's reasoning." Rappa, 18 F.3d at 1057 (quoting King v. Palmer, 950 F.2d 771, 781 (D.C. Cir. 1991) (en banc)). Thus, in cases where approaches differ, no particular standard is binding on an inferior court because none has received the support of a majority of the Supreme Court. Id. at 1058.

As to the immediate situation, we recognized in Unity Real Estate that "Justice Kennedy's substantive due process reasoning is not a `narrower' ground that we might take to constitute the controlling holding." 1999 WL 167765, at *9. In such a case, then, the only binding aspect of a splintered decision is its specific result, in Eastern Enterprises the Court's "holding the Coal Act unconstitutional as applied to Eastern Enterprises." Association of Bituminous Contractors, Inc. v. Apfel, 156 F.3d 1246, 1255 (D.C. Cir. 1998). Eastern Enterprises requires a finding that the Coal Act is unconstitutional as applied to Anker, then, only if Anker "stand[s] in a substantially identical position to Eastern Enterprises with respect to both the plurality and Justice Kennedy's concurrence." Unity Real Estate, 1999 WL 167765, at *9.3

_____

3. We also recognized in Unity Real Estate that in light of Eastern Enterprises' concurrence and dissent, we are "bound to follow the five-four vote against the takings claim. . . ." Unity Real Estate, 1999 WL 167765, at *9. See Eastern Enters., 524 U.S. at ___, 118 S.Ct. 2156 (Kennedy, J., concurring) ("The Coal Act neither targets a specific property interest nor depends upon any particular property for the operation of its statutory mechanisms."); id.  at ___, 118 S.Ct. at 2161 (Breyer, J., dissenting) ("The `private property' upon which the Clause traditionally has focused is a specific interest in physical or intellectual
property."); also Association of Bituminous Contractors, 156 F.3d at 1254 n.5 ("The only conceivable change in takings jurisprudence brought about by Eastern Enterprises is that thefive dissenting justices . . . apparently believe that the imposition of liability alone is not a taking of
property under the Fifth Amendment.").

15

Applying Eastern Enterprises in accordance with the foregoing methodology is not difficult inasmuch as its plurality and concurrence both found significant the fact that Eastern Enterprises was not a signatory to either the 1974 or 1978 NBCWAs, and thus it did not contemplate either being responsible for or contributing to the miners' expectation of lifetime benefits. The plurality recognized that while the takings inquiry is "essentially ad hoc and fact intensive" the Court, in prior decisions, had identified three factors that are particularly significant: " `the economic impact of the regulation, its interference with reasonable investment backed expectations, and the character of the governmental action.' " 524 U.S. at ___, 118 S.Ct. at 2146 (quoting Kaiser Aetna v. United States, 444 U.S. 164, 175, 100 S.Ct. 383, 390 (1979)). The plurality then summarized its takings case law as follows:

> Our opinions . . . make clear that Congress has considerable leeway to fashion economic legislation, including the power to affect contractual commitments between private parties. Congress also may impose retroactive liability to some degree particularly where it is `confined to short and limited periods required by the practicalities of producing national legislation.' Our decisions, however, have left open the possibility that legislation might be unconstitutional if it imposes severe retroactive liability on a limited class of parties that could not have anticipated the liability, and the extent of that liability is substantially disproportionate to the parties' experience.

Id. at ___, 118 S.Ct. at 2149 (quoting Pension Benefit Guar. Corp. v. R.A. Gray & Co., 476 U.S. 717, 731, 104 S.Ct. 2709, 2719 (1984)) (internal quotation marks omitted) (emphasis added) (citation omitted).

Applying these precepts, the plurality held that the Coal Act placed a "considerable financial burden" upon Eastern Enterprises, which was liable for between $50 and $100 million in cumulative payments. Id. at ___,118 S.Ct. at 2149. The plurality acknowledged that this type offinancial burden was not a per se taking –– "a permanent physical occupation of . . . property" –– yet noted that the Court's decisions upholding the Multiemployer Pension

16

Amendments Act of 1980 to supplement ERISA suggested that "an employer's statutory liability for multiemployer plan benefits should reflect some `proportion[ality] to its experience with the plan.' " Id. at ___, 118 S.Ct. at 2149 (quoting Concrete Pipe & Prods. of Cal., Inc. v. Construction Laborers Pension Trust for S. Cal., 508 U.S. 602, 645, 113 S.Ct. 2264, 2291 (1993)). The plurality found this proportionality lacking because "while Eastern contributed to the 1947 and 1950 W&R Funds, it ceased its coal mining operations in 1965 and neither participated in negotiations nor agreed to make contributions in connection with the Benefit Plans under the 1974, 1978, or subsequent NBCWA's." Id. at ___, 118 S.Ct. at 2150 (emphasis added). This was significant because the 1974 and subsequent agreements "first suggest[ed] an industry commitment to the funding of lifetime health benefits for both retirees and their family members." Id. at ___, 118 S.Ct. at 2150. Thus, because Eastern Enterprises never had contemplated liability nor contributed to the miners' expectation of lifetime benefits, the plurality held that "the correlation between Eastern and its liability to the Combined Fund is tenuous, and the amount assessed against Eastern resembles a calculation `made in a vacuum.' " Id. at ___, 118 S.Ct. at 2150 (quoting Connolly v. Pension Benefit Guar. Corp., 475 U.S. 211, 225, 106 S.Ct. 1018, 1026 (1986)).

The plurality also found the lack of proportionality significant in its analysis of whether the Coal Act substantially interfered with Eastern Enterprises' reasonable investment backed expectations, and whether the nature of the governmental action was unusual. The plurality found that the Act's "substantial and particularly far reaching" retroactive effect interfered with Eastern Enterprises' reasonable investment backed expectations. Id. at ___, 118 S.Ct. at 2152. It noted that inasmuch as an employer in the coal industry could not have contemplated that it was promising lifetime benefits until 1974 when ERISA forced revisions to the 1950 Fund, the Coal Act's "scheme for allocation of Combined Fund premiums is not calibrated either to Eastern's past actions or to any agreement--implicit or otherwise--by the company." Id. at ___, 118 S.Ct. at 2152. Likewise, the plurality reasoned that

17

the governmental action was highly unusual and implicated fundamental principles of fairness because it "single[d] out certain employers to bear a burden that is substantial in amount, based on the employers' conduct far in the past, and unrelated to any commitment that the employers made or to any injury they caused. . . ." Id. at ___, 118 S.Ct. at 2153 (emphasis added). Therefore, each factor suggesting that the application of the Coal Act was an unconstitutional taking depended upon the fact that Eastern Enterprises had left the coal industry in 1965 and had not agreed to the 1974, 1978, or subsequent wage agreements.

Justice Kennedy, in finding the Coal Act's application to Eastern Enterprises violated substantive due process, also relied upon the fact that Eastern Enterprises had not signed the 1974 or following agreements. Justice Kennedy held that "[a]ccepted principles forbidding retroactive legislation" dictated that the application of the Act to Eastern Enterprises violates the Due Process Clause. Id. at ___, 118 S.Ct. at 2158 (Kennedy, J., concurring in judgment and dissenting in part). Applying an "arbitrary and irrational" standard of review, Justice Kennedy pointed out that the assessment of liability against Eastern Enterprises bore no legitimate relation to the government's asserted interest in holding responsible those coal companies that created an expectation of lifetime benefits and then abandoned the industry to avoid this commitment:

> As the plurality opinion discusses in detail, the expectation was created by promises and agreements made long after Eastern left the coal business. Eastern was not responsible for the resulting chaos in the funding mechanism caused by other coal companies leaving the framework of the National Bituminous Wage Agreement. This case is far outside the bounds of retroactivity permissible under our law.

Id. at ___, 118 S.Ct. at 2159 (citation omitted) (Kennedy, J., concurring in judgment and dissenting in part).

Thus, analysis of the decisions in Eastern Enterprises leads us to the conclusion that a majority of the Court would find the Act unconstitutional when applied to an

18

employer that did not agree to the 1974 or subsequent NBCWAs, while application of the Act to a signatory to the 1974 or a subsequent wage agreement would be an entirely different matter.

We believe the fact that Anker was a signatory to "me too" agreements from the 1970s until 1984 factually distinguishes Anker's situation from that of Eastern Enterprises and compels a finding that the Act is constitutional in this instance.4 This was, in fact, the Court of Appeals for the District of Columbia Circuit's reasoning in Association of Bituminous Contractors, 156 F.3d 1246, in upholding the application of the Act to operators similarly situated to plaintiffs here. Faced with signatory operators of the 1974 and subsequent agreements by incorporation by reference in related agreements, the court noted that "the crucial fact upon which the Eastern Enterprises plurality and Justice Kennedy relied in concluding that Eastern's Coal Act liability was disproportionate to its past conduct and thus unfairly retroactive--namely, Eastern's departure from the coal industry in 1965--is absent in this case." Id. at 1256. The court continued: "The clear implication of each opinion in Eastern Enterprises is that employer participation in the 1974 and 1978 agreements represents a sufficient amount of past conduct to justify the retroactive imposition of Coal Act liability (for the dissenting justices, of course, such participation is not even necessary)." Id. at 1257. See also Unity Real Estate, 1999 WL 167765, at *29 (Aldisert, J., concurring) ("The decisive material facts in Eastern Enterprises are that the company

_____

4. The difference between a member of the BCOA and a "me too" signatory to a NBCWA is of no consequence to this case despite Anker's contrary assertions. See, e.g., Connors v. Link Coal Co., 970 F.2d 902, 903 (D.C. Cir. 1992) (" `Me too' agreements have terms identical to the terms of the national agreement, and thus there is no distinction among them concerning employers' contractual rights and obligations."); Arizona Laborers, Teamster and Cement Masons Trust Fund v. Conquer Cartage Co., 753 F.2d 1512, 1518 (9th Cir. 1985) (defining a "me too" agreement as an agreement by which a smaller employer can obtain all the benefits of the master collective bargaining agreement without joining the industry association and incurring the costs of participating in industry negotiations or negotiating independently with the union).

19

(1) left the coal industry in 1965 and (2) was never a party to the 1974 and later Wage Agreements that first suggested the commitment to lifetime benefits for retirees and family members."). Thus, it appears that this case falls outside the specific holding of Eastern Enterprises, and we therefore find the Coal Act's application to Anker constitutional.

However, our opinion in Unity Real Estate directs us to apply an additional level of due process analysis designed to measure "the extent of the gap between the coal companies' contractual promises to the Funds and the requirements of the Coal Act." Id. at *10. We noted there that the proper standard of review for a due process analysis is whether Congress's action was arbitrary or irrational. Id. We concluded that Congress's determination that the coal industry acted in a way that created the miners' reasonable expectation of lifetime benefits, and that its finding that the coal companies were the most responsible parties for the deterioration of the Benefit Plans were "reasonable evaluations of the problem." Id. at *20.

We then held that the Act's retroactivity did not render it irrational in violation of due process. Id. We recognized that the "heart of retroactivity analysis is an evaluation of the extent of the burden imposed by a retroactive law in relation to the burdened parties' prior acts" and announced that "[w]here Congress acts reasonably to redress an injury caused or to enforce an expectation created by a party, it can do so retroactively." Id. at *20-*21.

In the first step of a retroactivity analysis, we measured the length of time of the retroactivity from the date the coal company's contractual obligations ceased to the passing of the Act, and held that Unity Real Estate's 11 years was not so extensive as to violate Justice Kennedy's standard, although we admitted that it was a "close case." Id. at *21. We, however, recognized that the burden the Coal Act imposes upon parties assessed liability is substantial. Id. at *22. Finally, turning to the proportionality issue, we found that the Coal Act imposes a burden justified by both the industry's conduct that created reasonable expectations of lifetime benefits -- creating a benefit fund legally obligated to pay out more funds than the operators were required to provide -- and conduct that created the problem of under

20

funding -- the same initial flaws in the funding mechanism compounded by the mass exodus of operators from the industry to avoid making further contributions to the funds. Id. at *25. This analysis led us to conclude that the Coal Act did not violate the Due Process Clause because Congress was entitled to redress the problems caused by "the companies' actions, through the BCOA through which negotiations with the unions were conducted, [which] created reasonable expectations about benefits and established a funding structure vulnerable to `dumping' retirees when companies left the industry." Id.

Applying Unity Real Estate's retroactivity analysis compels us to reach a similar conclusion here. The length of time since King Knob last agreed in a "me too" contract to abide by an NBCWA was eight years, and the length of time since King Knob agreed to an NBCWA in a contract with Consol was 11 years before Congress passed the Coal Act. We found 11 years to be acceptable, although a"close case," in Unity Real Estate. Id. at *21. Moreover, our proportionality analysis in Unity Real Estate applies full force here because King Knob was a signatory to the 1978 and subsequent NBCWAs, and thus bears the same responsibility as the plaintiffs in Unity Real Estate for creating the reasonable expectations and the problem of under-funding that the Coal Act redresses. Id. at *25.

While some language in Unity Real Estate suggests that we rested our holding on the operators' membership in the BCOA which had negotiated the agreements that created the miners' expectation of benefits, id. at *16-*18, we will not read this language to allow "me too" signatures to avoid the application of the Act. King Knob agreed to abide by those same NBCWAs that the plaintiffs in Unity Real Estate negotiated.5 Similarly, Anker's argument that its liability fails Unity Real Estate's proportionality test since King Knob was "never" responsible for contributing to the benefit funds misses the mark. Anker fails to realize that while Consol may have agreed to assume King Knob's payments to the benefit funds in its contract-mining agreements

_____

5. One of the plaintiffs in Unity Real Estate, was a "me too" signatory to the 1984 NBCWA after dropping out of the BCOA. Id. at *4.

21

spanning 1967 to 1982, King Knob, as a "me too" signatory to the NBCWAs was responsible in the first instance for the provision of these payments. King Knob's ability to have Consol assume this obligation is simply irrelevent to the fact that by agreeing to the NBCWAs King Knob was a party to the agreements that created the miners' expectation of lifetime benefits. King Knob benefitted as much as Consol from having the NBCWAs as those agreements kept a consistent work force in place in part by promising the provision of health and death benefits for the rest of the miners' lives.

Overall, inasmuch as nothing germane to our holding in Unity Real Estate distinguishes Anker from the plaintiffs in Unity Real Estate, application of that case's due process analysis leads us once again to conclude that the Act does not violate constitutional norms, this time as applied to the Anker. Thus, we find the Act constitutional as applied to Anker because of the factual distinction that makes Eastern Enterprises inapplicable, and because the case falls squarely under our analysis and holding in Unity Real Estate.

C. The Commissioner's Assignment of Beneficiaries to Anker

In reviewing the Commissioner's decision to assign beneficiaries to Anker, we decide whether her action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. S 706(2)(A). The Commissioner rejected Anker's arguments that Consol was the entity responsible for providing the miners' benefits. Anker had argued to the Social Security Administration

> that assignments made [because of Anker's affiliation with King Knob] should be reassigned to Consolidation Coal Co. because King Knob operated as an independent contractor mining lands owned or leased by Consol with no ownership rights in the minerals; that amounts paid by Consol to the UMWA plans were not deducted or credited against the amounts paid to King Knob for the mined coal; that upon termination of the agreement in 1982 Consol accepted responsibility for current and subsequent payments to the UMWA

22

>Welfare and Retirement Fund or any successor fund
>based on hours worked prior to the summer of 1982;
>[and] that for miners employed by King Knob after
>1982, responsibility should be pro-rated. . . .

App. at 33. The Commissioner instead determined that

>Under the Coal Act, ownership of a mine is immaterial
>to assignment decisions. Assignments are made solely
>on the basis of the signatory employer who employed
>the eligible retiree. In the case involving King Knob, an
>affiliate of Anker Energy, the signatory that employed
>the retirees was King Knob, not Consol. Also, for Coal
>Act purposes, SSA is not bound by any private
>agreements made between companies, nor does the
>Coal Act allow for pro-ration of premium payments
>between companies. In light of the foregoing, no
>assignments that were made to Anker on the basis of
>its relationship to King Knob Coal can be reassigned to
>Consol.

App. at 33. We will affirm the district court's grant of judgment on the pleadings on Count One upholding the Commissioner's assignment of beneficiaries to Anker, because we find that her decision was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. S 706(2)(A).

Anker contends that King Knob was merely the "nominal" employer of the miners, while Consol was a signatory operator in its own right under the Act that had received "the entire economic benefit which those miners created," and was "the entity which had responsibility for all payments required to be made to the UMWA Benefit Funds." Appellants' Brief at 26. We find these contentions to be without merit.

The Coal Act directs the Commissioner to assign each eligible beneficiary to a "signatory operator" who employed the beneficiary. 26 U.S.C. S 9706(a). Section 9706(a) also attempts to ensure that the specific assignment of a beneficiary is to the most recent and significant employer still in business. The Act defines a "signatory operator" as "a person which is or was a signatory to a coal wage agreement." 26 U.S.C. S 9701(c)(1). The term "coal wage

agreement" includes "the National Bituminous Coal Wage Agreement," as well as "any other agreement entered into between an employer in the coal industry and the United Mine Workers of America that required . . . the provision of health benefits to retirees of such employer . . . or contributions to the 1950 UMWA Benefit Plan or the 1974 UMWA Benefit Plan, or any predecessor thereof." 26 U.S.C. S 9701(b)(1). Finally, the Act provides that "employment of a coal industry retiree in the coal industry by a signatory operator shall be treated as employment by any related persons to such operator." 26 U.S.C. S 9706(b)(1)(A).

Applying these terms here, we uphold the Commissioner's conclusion that Anker is a related person to King Knob who was responsible for the provision of health benefits to the 1950 or 1974 Plans. First, King Knob was clearly a signatory operator under the Act. Anker admits that King Knob was a "me too" signatory to the 1974, 1978, 1981 and 1984 NBCWAs. App. at 8. Although it did not negotiate these agreements, as a "me too" signatory King Knob agreed to each of these NBCWAs, and agreed to contribute to the benefit funds. As such, King Knob falls under the Act. 26 U.S.C. S 9701.

Moreover, Anker does not contest the Commissioner's determination that it is a "related person" to King Knob under the Act, and we find that King Knob was without question the miners' employer. See Appellants' Brief at 26. Anker's pleadings and the record reveal as much. As an independent contractor, King Knob agreed in its contracts with Consol that

> all parties working for it in connection with the undertaking covered by this Agreement shall be its employees subject only to its orders and supervision. . . . Neither Consol nor any of its agents, servants or employees shall have the right to direct, supervise or control the manner or method in which the work is to be performed.

App. at 66. Anker confuses the matter by stating that King Knob was only the miners' "nominal" employer, and that Consol had received the entire "economic benefit" from the miners' efforts. The Act does not mention the term

24

"nominal" employer, nor does the term have any independent meaning in the context here. Likewise, the Act does not assess premiums based upon who received the "economic benefit" of the miners' work. Moreover, we do not accept the accuracy of Anker's denial that King Knob benefitted economically from its employees' mining efforts. After all, Consol was paying King Knob for its services.

Furthermore, we find Anker's argument unpersuasive that King Knob was not the correct signatory employer because it never had made contributions to the benefit fund inasmuch as Consol always paid King Knob's premiums according to their mining agreements. As a "me too" signatory to the 1974, 1978, 1981 and 1984 NBCWAs, King Knob was responsible for making payments for its employees to the benefit funds. Even though Consol apparently relieved King Knob of this responsibility by making all of its payments to the funds, such a contractual agreement does not lead us to conclude that King Knob was not a signatory operator responsible for making payments to the funds. Thus, we cannot say that the Commissioner's assignment of beneficiaries to Anker is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. S 706(2)(A).

D. Contract for Reimbursement

In granting Consol's motion for judgment on the pleadings on Count Two the district court relied upon contract and statutory interpretation in holding that Consol is not liable to reimburse Anker for payments made to the Combined Fund for the eligible retirees who worked for King Knob pursuant to its mining contracts with Consol. First, the court held that the language in the settlement agreement6 was clear and unambiguous. Anker I at 22.
_____

6. Once again, the pertinent portion of the settlement agreement states:

    (b) Consol shall promptly reimburse King Knob for all subsequent payments due to the UMWA Fund or any successor fund attributable to (i) tonnage of coal produced under the Contracts, (ii) hours worked at the mine operated under the Robinson Run Contract on or before August 31, 1982, and (iii) hours worked at the mines operated under the Booth Contract on or before June 30, 1982.

App. at 17, 97.

Next, the court determined that inasmuch as the contract provides for reimbursement "attributable to" either the tonnage of coal produced or the hours miners worked for King Knob under the contracts with Consol, King Knob was entitled to reimbursement only if the premiums Anker paid to the Combined Fund were "attributable to" either factor. Id. Because the Coal Act funds health benefits, according to the district court, "by the imposition of what is, in essence, a tax," it held that Consol was not obligated to reimburse Anker for its payments. Id. at 23. The court also held that even if Consol was contractually responsible for reimbursing Anker, Anker still could not maintain its action against Consol because the Coal Act "abrogated pre-act contracts reallocating mining companies' obligations to pre-Act benefit plans." Id. at 24 n.17. We will reverse the district court's order granting judgment on the pleadings in favor of Consol on Count Two for reimbursement because we reject the district court's conclusions with respect to the count.

### 1. Contractual liability

Anker urges us to reverse based upon the district court's refusal to consider extrinsic evidence in light of its holding the contractual language clear and unambiguous. Appellants' Brief at 28. Under Pennsylvania law, which is applicable here, a court can consider parol evidence only if the contractual language is ambiguous. See Allegheny Int'l, Inc. v. Allegheny Ludlum Steel Corp., 40 F.3d 1416, 1427-28 (3d Cir. 1994); Langer v. Monarch Life Ins. Co., 879 F.2d 78, 81 n.8 (3d Cir. 1989).

We hold that the district court erred in deciding that paragraph 4(b) of the settlement agreement is clear and unambiguous. The provision states that Consol will reimburse King Knob for "all subsequent payments" due to the then-current "UMWA Fund" or "any successor fund." These payments must be "attributable to" either tonnage of coal or hours worked under the contracts. Inasmuch as the Coal Act does not assign liability based upon the amount of coal mined or hours worked by miners, the court granted Consol's motion for judgment on the pleadings.

26

In so doing, the court failed to acknowledge that "tonnage of coal" and "hours worked" were the methods used to determine an employer's premiums for the 1950 and 1974 Funds. By placing this language in the agreement, the parties could have been agreeing, as Anker contends, that Consol would be responsible for any payments owed to these Funds or any successor fund arising from the work performed pursuant to the mining contracts. The district court, then, failed to read the mention of "tonnage of coal" and "hours worked" consistently with industry usage.

In fact, reading the provision to bind Consol to reimburse King Knob for any future benefit payments related to the work completed under the contracts would be consistent with the parties' inclusion of the term "successor fund" in the agreement. As Anker pointed out in its brief, inasmuch as there was no "successor fund" to the UMWA Fund at the time of the settlement agreement, inclusion of this term signifies that the parties were contemplating possible responsibility for payment of future benefits to a future fund. Appellants' Brief at 33. Otherwise, inclusion of this language in the contract makes no sense.

The district court also incorrectly interpreted the contract to bar reimbursement because the Coal Act does not assess premiums based upon the tonnage of coal and hours worked. While the Coal Act does not determine specifically the premiums due based upon coal tonnage and hours worked, the Act is concerned with operators who had contributed to the 1950 and 1974 Plans which were funded based on coal tonnage and hours worked. The Combined Fund, by its very terms, is a successor plan, born on February 1, 1993, when the Act mandated that "the settlors of the 1950 UMWA Benefit Plan and the 1974 UMWA Benefit Plan shall cause such plans to be merged into the Combined Fund. . . ." 26 U.S.C. S 9702(a)(2). By concentrating on the method of funding and ignoring the industry significance of coal tonnage and hours worked, the district court incorrectly held that, as a matter of law, Consol was not liable to Anker for payments made for King Knob's employees under its contracts with Consol. While we do not take a position as to Anker's ultimate success in proving that Consol is in fact liable to it for the premiums

for the miners assigned to it under the Act, we conclude that the district court's disposing of the issue on the pleadings was premature, and that further proceedings with respect to it are necessary.7

### 2. Abrogation of contractual agreements

The district court followed the decision of a divided panel of the Court of Appeals for the Fourth Circuit in Carbon Fuel Co. v. USX Corp., 100 F.3d 1124 (4th Cir. 1996), when it held that the Coal Act abrogates private contracts for indemnification or reimbursement. Anker I at 24 n.17. However, considering the Supreme Court's statements in Eastern Enterprises concerning the language of the Act, we will not follow Carbon Fuel. Instead, we hold that the Coal Act does not prohibit indemnification or reimbursement pursuant to previous contractual arrangements.

The Eastern Enterprises plurality stated that "the Act preserves Eastern's right to pursue indemnification," although it does not grant any new rights, including a right to reimbursement. 524 U.S. at ___, 118 S.Ct. at 2150. The Court was referring to 26 U.S.C. S 9706(f)(6) which states: "Nothing in this section shall preclude the right of any person to bring a separate civil action against another person for responsibility for assigned premiums, notwithstanding any prior decision by the Commissioner."

In so stating, the Supreme Court (implicitly) disagreed with Carbon Fuel, 100 F.3d 1124, where the court of appeals interpreted the Act to prohibit suits for indemnification or reimbursement based upon prior private contracts. Id. at 1133. The court of appeals relied on section 9708, which states that "[a]ll liability for contributions to the Combined Fund that arises on or after February 1, 1993, shall be determined exclusively under this chapter. . . ." The court also found persuasive excerpts from the legislative history stating that Congress "expressly

_____

7. Consol points out that King Knob retained certain employees after its agreements with it were terminated. At this time we do not deal with the significance of this fact which was not material to the district court's disposition of the reimbursement claim. Of course, paragraph 4(b) of the settlement agreement has temporal limits.

28

intended to `reach back' and impose obligations on signatories to the NBCWAs notwithstanding that many companies had `bargained out of their funding obligations.' " Carbon Fuel, 100 F.3d at 1129 (quoting 138 Cong. Rec. S17566-01, S17603). Despite the fact that no language in the Act limits the scope of section 9706(f)(6), the court of appeals interpreted its preservation of private actions to apply only to "post-Act private agreements and contracts." Id. at 1134.

We cannot accept this reasoning. As the concurrence in Carbon Fuel pointed out, section 9708's statement that all liability will be determined under the Act does not abrogate a private party's liability to another private party for indemnification. Id. at 1140 (Williams, J., concurring in judgment). Instead, this provision provides that"[a]n operator assigned Coal Act liability by the Commissioner is primarily liable and must pay into the Combined Fund, regardless of the operator's private, pre-Act contractual rights." Id. Section 9706(f)(6), then, does not provide for the reassignment of primary liability for a signatory operator, but instead "preserves the right of private civil action for determining responsibility for assigned premiums as between contracting parties." Id. at 1141.

We agree with this reading of the Act.8  Section 9706(f)(6) explicitly preserves a person's right "to bring a separate civil action against another person for responsibility for assigned premiums. . . ." This provision does not limit itself to post-Act contracts, and without an explicit congressional statement otherwise, we will not construe the Act to contravene the seemingly unambiguous Congressional desire to allow for private actions between parties for reimbursement or indemnification.

Moreover, we believe that our reading of the Act is, in fact, consistent with the legislative history upon which the majority in Carbon Fuel relies. While Congress no doubt wanted to "reach back" and ensure that companies could

_____

8. Even if our reading of section 9706(f)(6) is incorrect, we believe that we
would need a clearer expression of Congress's intent for us to agree with Carbon Fuel that the Coal Act abrogates an entire class of private contracts.

29

not contract out of their obligations to the Funds, the Coal Act solves this problem by making the signatory companies responsible in the first instance for premiums. Once the Commissioner correctly assigns retirees to an operator, liability to the Funds is guaranteed. Allowing for indemnification between private parties if a previous contractual agreement so provides in no way frustrates this goal. Indeed, it may further the goal by providing for an additional entity to be liable, albeit on a contractual basis, for the payments due the Fund.

We believe the correct reading of congressional intent is that Congress desired the Act to be remedial -- that Congress wanted to ensure that miners would receive the benefits the industry promised and placed liability on the parties responsible for creating the problem in the first place. Whether these parties had contracted with other private organizations for indemnification in case of future liability is irrelevant. In fact, allowing for indemnification could provide for more complete funding inasmuch as small independent contractors such as King Knob are probably more likely to have gone out of business or to have insufficient funds to pay the sometimes substantial premiums than companies similar to Consol that owned and leased the mines.

Thus, we will reverse the district court's order granting Consol's motion for judgment on the pleadings on Count Two for indemnification and remand the count to the district court for further proceedings. The court erroneously found the contractual language clear and unambiguous, and erroneously interpreted the Coal Act to prohibit suits for indemnification or reimbursement based upon prior contractual arrangements.

E. Interest, liquidated damages, attorney's fees and costs

Finally, Anker contests the district court's assessment of interest, liquidated damages, fees and costs for its failure to provide the premiums timely by arguing that the Act does not provide for the assessment of these costs. Appellants' Brief at 38. We, however, will affirm the district court's judgment against Anker for these amounts. Anker misreads

30

the Coal Act, as it incorporates the assessment of liquidated damages and fees available in ERISA. See Holland v. Keenan Trucking Co., 102 F.3d 736, 739 (4th Cir. 1996) (affirming without comment the district court's order awarding liquidated damages, interest, fees and costs under the Coal Act); Holland v. Robert Coal Co., 986 F. Supp. 621, 633 (D.D.C. 1997) (granting Combined Fund's motion for summary judgment assessing liquidated damages, interest, fees and costs), aff'd, 1998 WL 794832 (D.C. Cir. Oct. 16, 1998); Holland v. High-Tech Collieries, Inc., 911 F. Supp. 1021, 1031-32 (N.D.W. Va. 1996) (same); Holland v. Double G Coal Co., 898 F. Supp. 351, 356 (S.D.W. Va. 1995) (same).

Section 9721 of the Coal Act states that "[t]he provisions of section 4301 of [ERISA] shall apply to any claim arising out of an obligation to pay any amount required to be paid by [the Coal Act] in the same manner as any claim arising out of an obligation to pay withdrawal liability under [ERISA]." 26 U.S.C. S 9721. Section 4301(b) of ERISA provides that the failure of an employer to make a timely withdrawal liability payment should be treated in the same manner as delinquent contributions. 29 U.S.C. S 1451(b). Finally, section 502 of ERISA requires a district court to award interest, liquidated damages, and reasonable attorneys' fees and costs when a plan successfully enforces a demand for delinquent payments. 29 U.S.C. S 1132(g)(2).9

Applying this statutory scheme to Anker, the district court correctly determined that Anker had not made contributions, and thus ERISA's enforcement provisions concerning delinquent contributions mandated the assessment of the proper fees. Anker III at 10. We find this decision clearly correct and uphold the judgment against Anker.10

_____

9. We have held that interest, liquidated damages, fees and costs are mandatory charges in withdrawal liability cases under ERISA. See United Retail & Wholesale Employees Teamsters Union Local No. 115 Pension Plan v. Yahn & McDonnell, Inc., 787 F.2d 128, 134-35 (3d Cir. 1986); see also Huber v. Casablanca Indus., Inc., 916 F.2d 85, 191 n.34 (3d Cir. 1990).

10. As the district court noted, Anker's reliance on Laborers Health and Welfare Trust Fund for N. Cal. v. Advanced Lightweight Concrete Co., 484 U.S. 539, 108 S.Ct. 830 (1988), is sorely misplaced in light of the fact that, unlike the NLRA which was involved there, the Coal Act specifically incorporates ERISA's enforcement provisions. Anker III at 9-10.

31

IV. CONCLUSION

For the foregoing reasons, we will affirm the district court's order granting judgment on the pleadings on Anker's claim on Count One that the Commissioner's assignment was erroneous, and will affirm the district court's order granting summary judgment on the constitutionality of the Act as applied to Anker and King Knob on Count Three as well as its award of liquidated damages, interest, fees and costs on the counterclaim. However, we will reverse the district court's order granting judgment on the pleadings on Anker's contractual claim for reimbursement on Count Two and will remand the case to the district court for further proceedings on that count consistent with this opinion. The parties will bear their own costs on this appeal.

A True Copy:
Teste:

     Clerk of the United States Court of Appeals
     for the Third Circuit