*119 Justice Scalia
delivered the opinion of the Court.
The Nevada Supreme Court invalidated a recusal provision of the State’s Ethics in Government Law as unconstitutionally overbroad in violation of the First Amendment. We consider whether legislators have a personal, First Amendment right to vote on any given matter.
I
Nevada’s Ethics in Government Law provides that a public, officer shall not vote upon or advocate the passage or failure of, but may otherwise participate in the consideration of, a matter with respect to which the independence of judgment of a reasonable person in his situation would be materially affected by,” inter alia, “[h]is commitment in a private capacity to the interests of others.” Nev. Rev. Stat. § 281A.420(2) (2007).[1] Section 28lA.420(8)(a)-(d) of the law defines the term “commitment in a private capacity to the *120 interests of others” to mean a “commitment to a person” who is a member of the officer's household; is related by blood, adoption, or marriage to the officer; employs the officer or a member of his household; or has a substantial and continuing business relationship with the officer. Paragraph (e) of the same subsection adds a catchall to that definition: “[a]ny other commitment or relationship that is substantially similar” to one of those listed in paragraphs (a)-(d).
The Ethics in Government Law is administered and enforced by the petitioner in this litigation, the Nevada Commission on Ethics. In 2005, the Commission initiated an investigation of Michael Carrigan, an elected member of the City Council of Sparks, Nevada, in response to complaints that Carrigan had violated §281A.420(2) by voting to approve an application for a hotel/casino project known as the “Lazy 8.” Carrigan, the complaints asserted, had a disabling conflict in the matter because his long-time friend and campaign manager, Carlos Vasquez, worked as a paid consultant for the Red Hawk Land Company, which had proposed the Lazy 8 project and would benefit from its approval.
Upon completion of its investigation, the Commission concluded that Carrigan had a disqualifying conflict of interest under §281A.420(8)(e)’s catchall provision because his relationship with Vasquez was “substantially similar” to the prohibited relationships listed in § 281A.420(8)(a)-(d). Its written decision censured Carrigan for failing to abstain from voting on the Lazy 8 matter, but did not impose a civil penalty because his violation was not willful, see §281A.480. (Before the hearing, Carrigan had consulted the Sparks city attorney, who advised him that disclosing his relationship with Vasquez before voting on the Lazy 8 project, which he did, would satisfy his obligations under the Ethics in Government Law.)
Carrigan filed a petition for judicial review in the First Judicial District Court of the State of Nevada, arguing that the provisions of the Ethics in Government Law that he was *121 found to have violated were unconstitutional under the First Amendment. The District Court denied the petition, but a divided Nevada Supreme Court reversed. The majority held that voting was protected by the First Amendment, and, applying strict scrutiny, found that § 281A.420(8)(e)’s catchall definition was unconstitutionally overbroad. 126 Nev. 277, 284-288, 236 P. 3d 616, 621-624 (2010).
We granted certiorari, 562 U. S. 1127 (2011).
rH H-(
The First Amendment prohibits laws “abridging the freedom of speech,” which, ‘“as a general matter . . . means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content.’” Ashcroft v. American Civil Liberties Union, 535 U. S. 564, 573 (2002) (quoting Bolger v. Youngs Drug Products Corp., 463 U. S. 60, 65 (1983)). But the Amendment has no application when what is restricted is not protected speech. See, e. g., Roth v. United States, 354 U. S. 476, 483 (1957) (obscenity not protected speech). The Nevada Supreme Court thought a legislator’s vote to be protected speech because voting “is a core legislative function.” 126 Nev., at 284, 236 P. 3d, at 621 (internal quotation marks omitted).
We disagree, for the same reason. But before discussing that issue, we must address a preliminary detail: The challenged law not only prohibits the legislator who has a conflict from voting on the proposal in question, but also forbids him to “advocate the passage or failure” of the proposal — evidently meaning advocating its passage or failure during the legislative debate. Neither Carrigan nor any of his amici contend that the prohibition on advocating can be unconstitutional if the prohibition on voting is not. And with good reason. Legislative sessions would become massive town-hall meetings if those who had a right to speak were not limited to those who had a right to vote. If Carrigan was constitutionally excluded from voting, his exclusion from *122 “advocating]” at the legislative session was a reasonable time, place, and manner limitation. See Clark v. Community for Creative Non-Violence, 468 U. S. 288, 293 (1984).
rH H-Í HH
[A] universal and long-established tradition of prohibiting certain conduct creates a strong presumption that the prohibition is constitutional: Principles of liberty fundamental enough to have been embodied within constitutional guarantees are not readily erased from the Nation’s consciousness.” Republican Party of Minn. v. White, 536 U. S. 765, 785 (2002) (internal quotation marks omitted). Laws punishing libel and obscenity are not thought to violate “the freedom of speech” to which the First Amendment refers because such laws existed in 1791 and have been in place ever since. The same is true of legislative recusal rules. The Nevada Supreme Court and Carrigan have not cited a single decision invalidating a generally applicable conflict-of-interest recusal rule — and such rules have been commonplace for over 200 years.
“[E]arly congressional enactments ‘provid[e] contemporaneous and weighty evidence of the Constitution’s meaning,’ ” Printz v. United States, 521 U. S. 898, 905 (1997) (quoting Bowsher v. Synar, 478 U. S. 714, 723-724 (1986)). That evidence is dispositive here. Within 15 years of the founding, both the House of Representatives and the Senate adopted recusal rules. The House rule — to which no one is recorded as having objected, on constitutional or other grounds, see D. Currie, The Constitution in Congress: The Federalist Period 1789-1801, p. 10 (1997) — was adopted within a week of that chamber’s first achieving a quorum.[2] The rule read: “No member shall vote on any question, in the event of which he is immediately and particularly interested.” 1 Annals of *123 Cong. 99 (1789). Members of the House would have been subject to this recusal rule when they voted to submit the First Amendment for ratification; their failure to note any inconsistency between the two suggests that there was none.
The first Senate rules did not include a recusal requirement, but Thomas Jefferson adopted one when he was President of the Senate. His rule provided as follows:
“Where the private interests of a member are concerned in a bill or question, he is to withdraw. And where such an interest has appeared, his voice [is] disallowed, even after a division. In a case so contrary, not only to the laws of decency, but to the fundamental principles of the social compact, which denies to any man to be a judge in his own cause, it is for the honor of the house that this rule, of immemorial observance, should be strictly adhered to.” A Manual of Parliamentary Practice for the Use of the Senate of the United States 31 (1801).
Contemporaneous treatises on parliamentary procedure track parts of Jefferson’s formulation. See, e. g., A. Clark, Manual, Compiled and Prepared for the Use of the [New York] Assembly 99 (1816); L. Cushing, Manual of Parliamentary Practice, Rules of Proceeding and Debate in Deliberative Assemblies 30 (7th ed. 1854).
Federal conflict-of-interest rules applicable to judges also date back to the founding. In 1792, Congress passed a law requiring district court judges to recuse themselves if they had a personal interest in a suit or had been counsel to a party appearing before them. Act of May 8, 1792, ch. 36, §11, 1 Stat. 278-279. In 1821, Congress expanded these bases for recusal to include situations in which “the judge ... is so related to, or connected with, either party, as to render it improper for him, in his opinion, to sit on the trial of such suit.” Act of Mar. 3, 1821, ch. 51, 3 Stat. 643. The statute was again expanded in 1911, to make any “personal *124 bias or prejudice” a basis for recusal. Act of Mar. 3, 1911, §21,36 Stat. 1090. The current version, which retains much of the 1911 version’s language, is codified at 28 U. S. C. § 144. See generally Liteky v. United States, 510 U. S. 540, 544 (1994); Frank, Disqualification of Judges, 56 Yale L. J. 605, 626-630 (1947) (hereinafter Frank). There are of course differences between a legislator’s vote and a judge’s, and thus between legislative and judicial recusal rules; nevertheless, there do not appear to have been any serious challenges to judicial recusal statutes as having unconstitutionally restricted judges’ First Amendment rights.[3]
The Nevada Supreme Court’s belief that recusal rules violate legislators’ First Amendment rights is also inconsistent with longstanding traditions in the States. A number of States, by common-law rule, have long required recusal of public officials with a conflict. See, e. g., In re Nashua, 12 N. H. 425, 430 (1841) (“If one of the commissioners be interested, he shall not serve”); Commissioners’ Court v. Tarver, 25 Ala. 480, 481 (1854) (“If any member . . . has a peculiar, personal interest, such member would be disqualified”); Stubbs v. Florida State Finance Co., 118 Fla. 450, 452, 159 So. 527, 528 (1935) (“[A] public official cannot legally participate in his official capacity in the decision of a question in which he is personally and adversely interested”).[4] Today, *125 virtually every State has enacted some type of recusal law, many of which, not unlike Nevada's, require public officials to abstain from voting on all matters presenting a conflict of interest. See National Conference of State Legislatures, Voting Recusal Provisions (2009), online at http:// www.nesl.org/7TabID-15357 (as visited June 9, 2011, and available in Clerk of Court's case file).
In an attempt to combat this overwhelming evidence of constitutional acceptability, Carrigan relies on a handful of lower-court cases from the 1980's and afterwards. See Brief for Respondent 25 (citing Clarke v. United States, 886 F. 2d 404 (CADC 1989); Miller v. Hull, 878 F. 2d 523 (CA1 1989); and Camacho v. Brandon, 317 F. 3d 153 (CA2 2003)). Even if they were relevant, those cases would be too little and too late to contradict the long-recognized need for legislative recusal. But they are not relevant. The first was vacated as moot, see Clarke v. United States, 915 F. 2d 699, 700, 706 (CADC 1990) (en banc), and the other two involve retaliation amounting to viewpoint discrimination. See Miller, supra, at 533; Camacho, supra, at 160. In the past we have applied heightened scrutiny to laws that are viewpoint discriminatory even as to speech not protected by the First Amendment, see R. A. V. v. St. Paul, 505 U. S. 377, 383-386 (1992). Carrigan does not assert that the recusal laws here are viewpoint discriminatory, nor could he: The statute is content-neutral and applies equally to all legislators regardless of party or position.
IV
But how can it be that restrictions upon legislators’ voting are not restrictions upon legislators’ protected speech? The answer is that a legislator's vote is the commitment of his apportioned share of the legislature’s power to the passage *126 or defeat of a particular proposal. The legislative power thus committed is not personal to the legislator but belongs to the people; the legislator has no personal right to it. As we said in Raines v. Byrd, 521 U. S. 811, 821 (1997), when denying Article III standing to legislators who claimed that their voting power had been diluted by a statute providing for a line-item veto, the legislator casts his vote “as trustee for his constituents, not as a prerogative of personal power.” In this respect, voting by a legislator is different from voting by a citizen. While “a voter’s franchise is a personal right,” “[t]he procedures for voting in legislative assemblies . pertain to legislators not as individuals but as political representatives executing the legislative process.” Coleman v. Miller, 307 U. S. 433, 469-470 (1939) (opinion of Frankfurter, J.).
Carrigan and Justice Alito say that legislators often “ ‘us[e] their votes to express deeply held and highly unpopular views, often at great personal or political peril.’” Post, at 133 (opinion concurring in part and concurring in judgment) (quoting Brief for Respondent 23). How do they express those deeply held views, one wonders? Do ballots contain a check-one-of-the-boxes attachment that will be displayed to the public, reading something like “( ) I have a deeply held view about this; ( ) this is probably desirable; ( ) this is the least of the available evils; ( ) my personal view is the other way, but my constituents want this; ( ) my personal view is the other way, but my big contributors want this; ( ) I don’t have the slightest idea what this legislation does, but on my way in to vote the party Whip said vote 'aye' ”? There are, to be sure, instances where action conveys a symbolic meaning — such as the burning of a flag to convey disagreement with a country’s policies, see Texas v. Johnson, 491 U. S. 397, 406 (1989). But the act of voting symbolizes nothing. It discloses, to be sure, that the legislator wishes (for whatever reason) that the proposition on the floor be adopted, just as a physical assault discloses that the attacker dislikes the vie- *127 tim. But neither the one nor the other is an act of communication, Cf. Rumsfeld v. Forum for Academic and Institutional Rights, Inc., 547 U. S. 47, 66 (2006) (expressive value was “not created by the conduct itself but by the speech that accompanies it”).
Moreover, the fact that a nonsymbolic act is the product of deeply held personal belief — even if the actor would like it to convey his deeply held personal belief — does not transform action into First Amendment speech. Nor does the fact that action may have social consequences — such as the unpopularity that cost John Quincy Adams his Senate seat resulting from his vote in favor of the Embargo Act of 1807, see post, at 133. However unpopular Adams’ vote may have made him, and however deeply Adams felt that his vote was the right thing to do, the act of voting was still nonsym-bolic conduct engaged in for an independent governmental purpose.
Even if it were true that the vote itself could “express deeply held and highly unpopular views,” the argument would still miss the mark. This Court has rejected the notion that the First Amendment confers a right to use governmental mechanics to convey a message. For example, in Timmons v. Twin Cities Area New Party, 520 U. S. 351 (1997), we upheld a State’s prohibition on multiple-party or “fusion” candidates for elected office against a First Amendment challenge. We admitted that a State’s ban on a person’s appearing on the ballot as the candidate of moré than one party might prevent a party from “using the ballot to communicate to the public that it supports a particular candidate who is already another party’s candidate,” id., at 362; but we nonetheless were “unpersuaded... by the party’s contention that it has a right to use the ballot itself to send a particularized message.” Id., at 362-363; see also Burdick v. Takushi, 504 U. S. 428, 438 (1992). In like manner, a legislator has no right to use official powers for expressive purposes.
*128 Carrigan and Justice Alito also cite Doe v. Reed, 561 U. S. 186 (2010), as establishing “the expressive character of voting.” Post, at 133; see also Brief for' Respondent 26. But Reed did no such thing. That ease held only that a citizen’s signing of a petition — “‘core political speech'” Meyer v. Grant, 486 U. S. 414, 421-422 (1988) — was not deprived of its protected status simply because, under state law, a petition that garnered a sufficient number of signatures would suspend the state law to which it pertained, pending a referendum. See Reed, 561 U. S., at 195; id., at 221-222 (Scalia, J., concurring in judgment). It is one thing to say that an inherently expressive act remains so despite its having governmental effect, but it is altogether another thing to say that a governmental act becomes expressive simply because the governmental actor wishes it to be so. We have never said the latter is true.[5]
Y
Carrigan raises two additional arguments in his brief: that Nevada’s catchall provision unconstitutionally burdens the right of association of officials and supporters, and that the provision is unconstitutionally vague. Whatever the merits of these arguments, we have no occasion to consider them. Neither was decided below: The Nevada Supreme Court made no mention of the former argument and said that it need not address the latter given its resolution of the over-breadth challenge, 126 Nev., at 282, n. 4, 236 P. 3d, at 619, n. 4. Nor was either argument raised in Carrigan’s brief in *129 opposition to the petition for writ of certiorari. Arguments thus omitted are normally considered waived, see this Court’s Rule 15.2; Baldwin v. Reese, 541 U. S. 27, 34 (2004), and we find no reason to sidestep that Rule here.
* * *
The judgment of the Nevada Supreme Court is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

It is so ordered.

 At tho timo of the relevant events in thic caeo, the disclosure and rcou sal. provisions of the Ethics in Government Law were codified at Nev, Rev. Stat. §281.501 (2003). They were recodified without relevant change in 2007 at § 281A.420, and all citations are to that version. The Nevada Legislature further amended the statute in 2009, see Nev. Stats., eh. 257, § 9.5, p. 1057, but those changes are not relevant here.

 The House first achieved a quorum on April 1,1789,1 Annals of Cong. 96, and it adopted rules governing its procedures on April 7, 1789, see id., at 98-99.

 We have held that restrictions on judges’ speech during elections are a different matter. See Republican Party of Minn. v. White, 536 U. S. 765, 788 (2002) (holding that it violated the First Amendment to prohibit announeomont of views on disputed legal and political issues by candidates for judicial election).

 A number of States enacted early judicial recusal laws as well. See, e. g., 1797 Vt. Laws, §23, p. 178 (“[N]o justice of the peace shall take cognizance of any cause, where he shall be within either the first, second, third, or fourth degree of affinity, or consanguinity, to either of the parties, or shall be directly or indirectly interested, in the cause or matter to be determined”); 1818 Mass. Laws, § 5, p. 632 (“[Wjhenever any Judge of Probate shall be interested in the estate of any person deceased, within the *125 county of ouch Judge, such eatatc shall be oettlcd in the Probato Court of the most ancient next adjoining county . . . ”); Macon v. Huff, 60 Ga. 221, 223-226 (1878). See generally Frank 609-626.

 Justice Auto reasons as follows: (1) If an ordinary citizen were to vote in a otraw poll on an ígguc pending before a lcgiolativc body, that vote would be speech; (2) if a member of the legislative body were to do the same, it would be no less expressive; therefore (3) the legislator’s actual vote must also be expressive. This conclusion does not follow. A legislator voting on a bill is not fairly analogized to one simply discussing that bill or expressing an opinion for or against it. The former is performing a governmental act as a representative of his constituents, see supra, at 126; only the latter is exercising personal First Amendment rights.