# United States Court of Appeals
### For the Eighth Circuit

_____

No. 19-1364
_____

Animal Legal Defense Fund; Iowa Citizens for Community Improvement; Bailing Out Benji; People for The Ethical Treatment of Animals, Inc.; Center for Food Safety,

*Plaintiffs - Appellees*,

v.

Kimberly Reynolds; Tom Miller, Attorney General of Iowa; Drew B. Swanson, Montgomery County Attorney,

*Defendants - Appellants.*

------------------------------

Brooke Kroeger; Ted Conover; Iowa Federation of Labor, AFL-CIO; Scholars of First Amendment and Information Law; Iowa Freedom of Information Council; United Farm Workers of America; Erwin Chemerinsky; 23 Media Organizations and Associations,

*Amici on Behalf of Appellee(s).*
_____

Appeal from United States District Court
for the Southern District of Iowa - Des Moines
_____

Submitted: September 22, 2020
Filed: August 10, 2021
_____

Before COLLOTON, GRUENDER, and GRASZ, Circuit Judges.
_____

COLLOTON, Circuit Judge.

In this appeal, we consider whether an Iowa statute prohibiting accessing agricultural production facilities by false pretenses and making false statements as part of an employment application to an agricultural production facility violates the First Amendment. The district court ruled that both provisions are unconstitutional and enjoined their enforcement. We affirm in part and reverse in part.

I.

In 2012, the Iowa General Assembly passed a bill entitled "Agricultural Production Facility Fraud." The statute states, in relevant part:

> A person is guilty of agricultural production facility fraud if the person willfully does any of the following:
>
> a. Obtains access to an agricultural production facility by false pretenses.
>
> b. Makes a false statement or representation as part of an application or agreement to be employed at an agricultural production facility, if the person knows the statement to be false, and makes the statement with an intent to commit an act not authorized by the owner of the agricultural production facility, knowing that the act is not authorized.

Iowa Code § 717A.3A(1)(a)-(b) (2012). A first conviction under the statute constitutes a serious misdemeanor, and any subsequent conviction constitutes an aggravated misdemeanor. *Id*. § 717A.3A(2)(a)-(b).

Several organizations sued three Iowa officials in their official capacities: Governor Kimberly Reynolds, Attorney General Tom Miller, and Montgomery County Attorney Drew Swanson. The plaintiffs asserted, among other things, that the statute abridged their freedom of speech in violation of the First and Fourteenth Amendments. Specifically, they alleged that but for the statute, they and their investigators would assume "false pretenses" and make "false statements" in the course of obtaining access to, or employment with, agricultural production facilities for the purpose of publicizing the treatment of animals at these facilities.

The district court granted summary judgment for the plaintiffs after concluding that both Iowa Code § 717A.3A(1)(a) (the "Access Provision") and § 717A.3A(1)(b) (the "Employment Provision") violate the First Amendment. The court entered an injunction against enforcement of the entire statute, § 717A.3A, including its punishment provisions in § 717A.3A(2)-(3). The State appeals, arguing that both disputed provisions are constitutional.

II.

The First Amendment, incorporated against the States through the Fourteenth Amendment, provides that "Congress shall make no law . . . abridging the freedom of speech." As a general matter, this "means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Nev. Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 121 (2011) (internal quotation omitted). "Content-based laws" are "those that target speech based on its communicative content." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). In general, content-based laws "are subject to strict scrutiny" and "are presumptively unconstitutional." *Id.* at 163-64.

Both the Access Provision and the Employment Provision constitute direct regulations of speech. The Access Provision targets false "pretenses," Iowa Code

-3-

§ 717A.3A(1)(a), and the Employment Provision targets false "statement[s]," *id.* § 717A.3A(1)(b). Pretenses may consist of nonverbal conduct, but that conduct constitutes "pretenses" only because it expresses information. "A law directed at the communicative nature of conduct" is treated like "a law directed at speech itself." *Texas v. Johnson*, 491 U.S. 397, 406 (1989) (emphasis and internal quotation omitted). Thus, the Access Provision's regulation of "pretenses," like the regulation of "statements," constitutes a direct regulation of speech. Both provisions also target expression for restriction on the basis of its content. Each prohibits expression that is "false," and an observer must examine the content of the speech to determine whether it is prohibited. *See Reed*, 576 U.S. at 163-64; *FCC v. League of Women Voters of Cal.*, 468 U.S. 364, 383 (1984).

In debating the constitutionality of the statute, the parties focus on *United States v. Alvarez*, 567 U.S. 709 (2012). *Alvarez* analyzed whether the Stolen Valor Act of 2005 violated the First Amendment by making it a crime for a person to "falsely represent[] himself or herself, verbally or in writing, to have been awarded any decoration or medal authorized by Congress for the Armed Forces." *Id*. at 715-16 (plurality opinion); *see* Pub. L. No. 109-437, § 3, 120 Stat. 3266, 3266 (2006) (current version at 18 U.S.C. § 704(b)-(c) (2018)). The Supreme Court declared the Act unconstitutional, but there is no opinion of the Court that sets forth a guiding rationale.

A plurality concluded that false speech is not in a general category that is presumptively unprotected. The plurality explained that where false claims are made knowingly or recklessly "to effect a fraud or secure moneys or other valuable considerations, say, offers of employment," then it is well established that the government may restrict speech without violating the First Amendment. *Alvarez*, 567 U.S. at 723. Citing prior decisions, the plurality also acknowledged that false speech is not protected in certain cases involving "defamation, fraud, or some other legally cognizable harm associated with a false statement, such as an invasion of privacy or

the costs of vexatious litigation." *Id.* at 719. But the plurality concluded that the Stolen Valor Act targeted "falsity and nothing more," and that it was subject to "exacting scrutiny" as a content-based restriction on speech. *Id.* at 715, 719. Applying what has also been described as "strict scrutiny," *see Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 442-43 (2015), the plurality determined that the government failed to show that the Act's restriction on false speech was "actually necessary" to achieve a compelling interest, or that the restriction was the "least restrictive means among available, effective alternatives." *Alvarez*, 567 U.S. at 726, 729 (internal quotation omitted). Accordingly, the Stolen Valor Act "infringe[d] upon speech protected by the First Amendment." *Id.* at 730.

An opinion concurring in the judgment concluded that the Stolen Valor Act violated the First Amendment for a different reason. Applying "intermediate scrutiny" to a law that proscribed false statements about "easily verifiable facts," the concurrence determined that the breadth of the prohibition created a significant risk of First Amendment harm, and that it was possible substantially to achieve the government's objectives in less burdensome ways. *Id.* at 732, 736-38 (Breyer, J., concurring in the judgment). Because the government did not convincingly explain why a more finely tailored statute would not work, the Act violated the First Amendment. *Id.* at 739.

When the Supreme Court is splintered, we attempt to apply the rule of *Marks v. United States*, 430 U.S. 188 (1977), to determine the controlling rule. But where a concurring opinion is not a logical subset of the plurality's rationale, or vice-versa, it is not possible to discern a holding in the case. *United States v. Bailey*, 571 F.3d 791, 798 (8th Cir. 2009); *King v. Palmer*, 950 F.2d 771, 781-82 (D.C. Cir. 1991) (en banc). That is the situation here. The *Alvarez* concurrence is arguably narrower than the plurality opinion because it applied intermediate scrutiny rather than exacting scrutiny. Yet the concurrence suggested more broadly that all false factual statements receive *some* protection under the First Amendment, while the plurality indicated that

certain false speech is outside the First Amendment.  Without a single rationale from *Alvarez* that can be identified as a holding in the case, the only binding aspect of the decision is its specific result.  *See Anker Energy Corp. v. Consolidation Coal Co.*, 177 F.3d 161, 170 (3d Cir. 1999).  Nevertheless, we bear in mind the reasoning of the various opinions as we seek to resolve this new dispute about restrictions on false statements.

### III.

We consider first the Access Provision, which provides that a person is guilty of agricultural production facility fraud if he "obtains access to an agricultural production facility by false pretenses."  Iowa Code § 717A.3A(1)(a).  The State argues that this provision is consistent with the First Amendment because it prohibits exclusively lies associated with a legally cognizable harm—namely, trespass to private property.  We agree with this conclusion.

The *Alvarez* plurality, in surveying prior statements of the Court declaring that false statements have no value or constitutional protection, explained that they all "derive from cases discussing defamation, fraud, or some other legally cognizable harm associated with a false statement, such as an invasion of privacy or the costs of vexatious litigation."  567 U.S. at 719.  Although none of the cited examples is precisely on point, trespass to private property is a comparable "legally cognizable harm," such that knowingly false speech designed to cause that harm should lead to a similar conclusion.

Trespass is an ancient cause of action that is long recognized in this country.  *See United States v. Jones*, 565 U.S. 400, 404-05 (2012); 3 William Blackstone, Commentaries *209.  Trespass by misrepresentation has a similar pedigree, *see De May v. Roberts*, 9 N.W. 146, 149 (Mich. 1881), and harm flowing from trespass is legally cognizable.  "From every unlawful entry, or every direct invasion of the

-6-

person or property of another, the law infers some damage." *Nichols v. City of Evansdale*, 687 N.W.2d 562, 573 (Iowa 2004) (quoting 75 Am. Jur. 2d *Trespass* § 117). Although falsity alone may not suffice to bring speech outside the First Amendment, there is no dispute that the term "false" in the Access Provision requires that false pretenses be assumed intentionally. *Cf. State v. Hoyman*, 863 N.W.2d 1, 16 (Iowa 2015). The better rule in light of *Alvarez* is that intentionally false speech undertaken to accomplish a legally cognizable harm may be proscribed without violating the First Amendment.

The district court concluded, however, that trespass onto private property does not result in a legally cognizable harm, because a property owner who suffers a trespass may be entitled to recover only nominal damages. The court reasoned that "nominal damage is just that—damage in name only." But the court's own citation to *Black's Law Dictionary* acknowledged that nominal damages are "awarded *when a legal injury is suffered* but there is no substantial loss or injury to be compensated." *Damages*, Black's Law Dictionary (10th ed. 2014) (emphasis added). Nominal damages are not "purely symbolic, a mere judicial token that provides no actual benefit to the plaintiff." *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 800-01 (2021). They are, rather, damages paid to a plaintiff that provide redress for an injury. *Id*. at 801. Even without physical damage to property arising from a trespass, these damages may compensate a property owner for a diminution of privacy and a violation of the right to exclude—legally cognizable harms. *See ALDF v. Wasden*, 878 F.3d 1184, 1205-06 (9th Cir. 2018) (Bea, J., dissenting in part and concurring in part); *see also Cedar Point Nursery v. Hassid*, No. 20-107, 2021 WL 2557070 (U.S. June 23, 2021) ("The right to exclude is one of the most treasured rights of property ownership.") (internal quotation omitted). We therefore conclude that the Access Provision's prohibition on assuming false pretenses to obtain access to an agricultural production facility is consistent with the First Amendment.

IV.

The plaintiffs also challenge the Employment Provision. This subsection provides that a person commits an offense if he "[m]akes a false statement or representation as part of an application or agreement to be employed at an agricultural production facility," if he "knows the statement to be false, and makes the statement with an intent to commit an act not authorized by the owner of the agricultural production facility, knowing that the act is not authorized." Iowa Code § 717A.3A(1)(b). The district court ruled this provision unconstitutional on its face under the First Amendment on the ground that it restricts protected speech and cannot satisfy either strict scrutiny or intermediate scrutiny.

The State argues on appeal that the provision does not proscribe protected speech because the *Alvarez* plurality concluded that "[w]here false claims are made to effect a fraud or secure moneys or *other valuable considerations, say, offers of employment*, it is well established that the Government may restrict speech without affronting the First Amendment." 567 U.S. at 723 (plurality opinion) (emphasis added). The State maintains that the Employment Provision simply prevents making false statements to secure an offer of employment, so it is constitutional.

We may assume for the sake of analysis that a narrowly tailored statute aimed at preventing false claims to secure offers of employment would pass constitutional muster. As the district court observed, however, the Iowa statute sweeps more broadly. The proscription of the Employment Provision does not require that false statements made as part of an employment application be material to the employment decision. As such, the statute is not limited to false claims that are made "to effect" an offer of employment; it allows for prosecution of those who make false statements that are not capable of influencing an offer of employment. Plausible scenarios abound: the applicant falsely professes to maintain a wardrobe like the interviewer's, exaggerates her exercise routine, or inflates his past attendance at the hometown

football stadium. *See generally* Rachel Feintzeig, *The Lies We Tell During Job Interviews*, Wall St. J., Jan. 11, 2021, at A11; Nicolas Roulin, *The Psychology of Job Interviews* 86-104 (2017). The plaintiffs assert that their investigators would make misrepresentations that include omitting their affiliation with the Animal Legal Defense Fund, omitting their status as licensed private investigators, downplaying their educational backgrounds, and "telling innocuous white lies to ingratiate themselves to their interviewers, such as 'I like your tie (or local sports team or company philosophy).'" R. Doc. 55-1, at 4 ¶ 13.

Given the breadth of the Employment Provision, it proscribes speech that is protected by the First Amendment and does not satisfy strict scrutiny. Insofar as the State has a compelling interest in preventing false statements made to effect offers of employment, a prohibition on immaterial falsehoods is not actually necessary to achieve the interest. There is a less restrictive means available: proscribe only false statements that are material to a hiring decision. *See Wasden*, 878 F.3d at 1201-02. If intermediate scrutiny were the standard, the absence of a materiality requirement distinguishes the Iowa statute from permissible prohibitions on fraud, perjury, and lying to government officials. *Alvarez*, 567 U.S. at 734-36 (Breyer, J., concurring in the judgment). While it is true that § 717A.3A(1)(b) requires proof of other elements, including intent to commit an unauthorized act in the agricultural facility, the fact remains that some persons may be prosecuted only because they make an immaterial false statement. Under either approach in the *Alvarez* majority, the scope of the Employment Provision is too broad to satisfy the First Amendment. *See also McCullen v. Coakley*, 573 U.S. 464, 496 & n.9 (2014); *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 804 (2011).

The State's principal response on materiality is that the phrase "false pretenses" requires proof of a material misrepresentation under Iowa law. *See Wilson v. Vanden Berg*, 687 N.W.2d 575, 584 (Iowa 2004). That reply is no help with respect to the Employment Provision, which proscribes making a "false statement" without such a

limitation. *See* Iowa Code § 717A.3A(1)(b). A narrowing construction of the Employment Provision to require proof of a material misrepresentation is not possible because the statute is not "readily susceptible" to the limitation. *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 397 (1988). This federal court cannot rewrite the Iowa Code to impute a limitation that the legislature declined to include.

\*     \*     \*

For these reasons, we affirm the district court's grant of summary judgment for the plaintiffs on Iowa Code § 717A.3A(1)(b), reverse the judgment declaring unconstitutional § 717A.3A(1)(a), vacate the injunction against enforcement of § 717A.3A(1)(a), (2), and (3), and remand for further proceedings.

GRASZ, Circuit Judge, concurring.

This case tests the outer boundaries of protection of speech under the First Amendment. It concerns the concept of "truth" and the constitutionality of the government punishing, through criminal sanctions, the use of false speech in order to obtain access to, or employment at, certain private facilities.

This nation was founded on the concept of objective truth ("We hold these truths to be self-evident . . . ."). And some of our nation's oldest institutions were founded as instrumentalities of the search for truth (*Veritas*). The quest for truth has not, of course, ended; nor has the clash between the free flow of ideas and the desire to punish untruthful speech that is perceived as harmful. The law has long provided for legal consequences for false speech constituting fraud, perjury, and defamation. The present case, however, presents a new category of deceit which the State of Iowa seeks to penalize. Some see it as investigative journalism. Others see it as lying to further an agenda at the expense of private property rights. In either sense, its punishment presents a legal dilemma between protecting property and protecting

speech. While some have always questioned whether truth can be known ("*What is truth?*"), our task is not to answer that question but simply to determine whether the constitution allows the government to criminally punish falsity in the specific context of the statute before us.

I join the court's opinion in full because I believe it is consistent with current law, as best we can determine it from limited and sometimes hazy precedent. Still, I do so hesitantly as to the Access Provision. The court's opinion today represents the first time any circuit court has upheld such a provision. At a time in history when a cloud of censorship appears to be descending, along with palpable public fear of being "cancelled" for holding "incorrect" views, it concerns me to see a new category of speech which the government can punish through criminal prosecution. Ultimately, the Supreme Court will have to determine whether such laws can be sustained, or whether they infringe on the "breathing room" necessary to effectuate the promise of the First Amendment.

Going forward, a key question will be whether access-by-deceit statutes will be applied to punish speech that has instrumental value or which is tied to political or ideological messages. The *Alvarez* decision, for the reasons noted in the court's opinion, is of limited guidance here. However, I find it significant that even the dissent in that case, while finding no value in the false speech there (lying about receiving high military honors), nonetheless recognized the principle that false speech which does have intrinsic or instrumental value may fall within the ambit of the Free Speech Clause. *See United States v. Alvarez*, 567 U.S. 709, 752 (2012) (Alito, J., dissenting). Most notably, the dissenting opinion states, "The false statements proscribed by the [Stolen Valor] Act are highly unlikely to be tied to any particular political or ideological message." *Id.* at 740–41. Whether that conclusion also holds true in the application of this or future access-by-deceit provisions remains to be seen.

GRUENDER, Circuit Judge, concurring in part and dissenting in part.

I join in Section III of the court's opinion holding that the Access Provision does not violate the First Amendment. However, I disagree with the court's *Marks* analysis and with its holding that the Employment Provision violates the First Amendment. I write separately to explain these disagreements and to offer additional support for the conclusion that the Access Provision is constitutional.

## I.

I begin by addressing the *Marks* analysis. As the court notes, *ante*, at 4-5, the Supreme Court held in *United States v. Alvarez* that the Stolen Valor Act was unconstitutional, but no majority of justices agreed on the rationale. *See* 567 U.S. 709, 714-16 (2012) (plurality opinion); *id.* at 730 (Breyer, J., concurring in the judgment). Under *Marks v. United States*, "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices," "the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." 430 U.S. 188, 193 (1977).

Where two opinions reach the same conclusion on different legal grounds, one is narrower than the other for *Marks* purposes if the former is a logical subset of the latter; that is, if the legal rule of decision in the latter entails the legal rule of decision in the former. *See United States v. Bailey*, 571 F.3d 791, 798 (8th Cir. 2009). However, the *Marks* rule "becomes problematic when one opinion supporting the judgment does not fit entirely within a broader circle drawn by the others." *Id.* (internal quotation marks omitted); *see also King v. Palmer*, 950 F.2d 771, 781 (D.C. Cir. 1991) (en banc) ("*Marks* is workable—one opinion can be meaningfully regarded as 'narrower' than another—only when one opinion is a logical subset of [the other].").

-12-

I agree with the court that, in *Alvarez*, neither the plurality nor the concurrence is a logical subset of the other. *See ante*, at 5. But unlike the court, I would not hold that this means that it is impossible to discern which is narrower and conclude that "the only binding aspect of the decision is its specific result." *See ante*, at 5-6. This approach may have support in the law of other circuits, *see, e.g.*, *Lair v. Bullock*, 697 F.3d 1200, 1205 (9th Cir. 2012); *United States v. Alcan Aluminum Corp.*, 315 F.3d 179, 189 (2d Cir. 2003); *Anker Energy Corp. v. Consol. Coal Co.*, 177 F.3d 161, 170 (3d Cir. 1999), but it is not the approach of our circuit. The court cites *Bailey*, *ante*, at 5, but *Bailey* stated that it is "difficult"—not impossible—"to determine which holding is the narrowest" when neither opinion is a logical subset of the other, 571 F.3d at 798. Historically, we have employed at least one other method for determining the narrowest opinion when the logical-subset test yields none. When a fractured Supreme Court sustains a constitutional challenge, we have followed the opinion that "would hold the fewest statutes unconstitutional." *Coe v. Melahn*, 958 F.2d 223, 225 (8th Cir. 1992). And even when we have determined that there is no narrowest opinion, we have not concluded that the only binding aspect of the decision is the judgment. Rather, looking to the reasoning in the various opinions, we have attempted to resolve the issue before us in the way that would have commanded the votes of any five justices of the Court, including any dissenters. *See Bailey*, 571 F.3d at 799 (citing *United States v. Johnson*, 467 F.3d 56, 66 (1st Cir. 2006)) (determining that there was jurisdiction under *Rapanos v. United States*, 547 U.S. 715 (2006), because the one-justice concurrence in the judgment and the four-justice dissent would both find jurisdiction).[1]

Here, it is not clear which of the two *Alvarez* opinions would hold the least number of statutes unconstitutional. One could argue that the plurality's approach

---

[1]Also, in *Hopkins v. Jegley*, we both identified a "controlling" opinion even though no opinion was a logical subset of another and noted that five justices, including four in the dissent, would have applied the controlling opinion's rule to the case before us. *See* 968 F.3d 912, 915 (8th Cir. 2020) (per curiam).

would hold fewer statutes unconstitutional because it would not subject statutes that prohibit lies associated with a "legally cognizable harm" or told for the "purpose of material gain" to First Amendment scrutiny at all. *See Alvarez*, 567 U.S. at 719, 723 (plurality opinion). The concurrence would subject these statutes to at least intermediate scrutiny. *See id.* at 730-31, 734-36 (Breyer, J., concurring in the judgment) (highlighting the "limiting features" of regulations of fraud, perjury, false claims, impersonation, and trademark infringement that enable them to hold up better under intermediate scrutiny than the Stolen Valor Act). However, one also could argue that the plurality would hold more statutes unconstitutional because it would apply strict scrutiny to laws, like the Stolen Valor Act, to which the concurrence would apply only intermediate scrutiny.

Given that neither the logical-subset test nor the test from *Coe* determines a narrowest opinion, I believe that our *Marks* jurisprudence leaves open two ways of proceeding. The first is to look to other circuits for additional methods of determining a narrowest opinion for *Marks* purposes. For instance, the Sixth Circuit has characterized the "narrowest opinion" as the "opinion that offers the least change to the law." *United States v. Cundiff*, 555 F.3d 200, 209 (6th Cir. 2009) (internal quotation marks omitted); *cf. Marks*, 430 U.S. at 193-94 (treating as controlling the opinion that proposed the least change to the government's ability to regulate obscenity under the First Amendment). The second is to resort to *Bailey*'s fallback approach that we use when *Marks* is inconclusive—resolving this case in the way that would have commanded the votes of five justices on the *Alvarez* Court. Here, both approaches lead to the same outcome.

Consider first the approach of following the "opinion that offers the least change to the law." *See id.* (internal quotation marks omitted). In *Alvarez*, that opinion is the plurality. The concurrence deviated from longstanding Supreme Court precedent by subjecting the content-based Stolen Valor Act to intermediate rather than strict scrutiny. *Compare Alvarez*, 567 U.S. at 731-32 (Breyer, J., concurring in

-14-

the judgment) (applying intermediate scrutiny to a content-based law), *with Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 799 (2011) (applying strict scrutiny to a content-based law); *United States v. Playboy Entm't Grp.*, 529 U.S. 803, 813 (2000) (same); *Burson v. Freeman*, 504 U.S. 191, 198-99 (1992) (same). The fact that the Supreme Court has continued, since *Alvarez*, to apply strict scrutiny to content-based regulations of speech and to decline invitations to relax this practice confirms how firmly entrenched this practice is in its caselaw. *See, e.g.*, *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. ---, 140 S. Ct. 2335, 2358 (2020) (Breyer, J., concurring in the judgment in part and dissenting in part) (criticizing the Court for "reflexively appl[ying] strict scrutiny to all content-based speech distinctions"); *Reed v. Town of Gilbert*, 576 U.S. 155, 176 (2015) (Breyer, J., concurring in the judgment) (parting ways with the majority on the basis that "the category 'content discrimination' is better considered . . . as a rule of thumb, rather than as an automatic 'strict scrutiny' trigger"). Therefore, the *Alvarez* concurrence proposed a more radical change to the law than the *Alvarez* plurality. And, for the reasons I explain in Sections II-III, the *Alvarez* plurality's reasoning requires upholding both the Access Provision and the Employment Provision. Thus, if we were to follow the "opinion that offers the least change to the law," *Cundiff*, 555 F.3d at 209, then we would be required to uphold both the Access Provision and the Employment Provision.

Now, consider the fallback approach of resolving this case in the way that would have commanded the votes of five justices on the *Alvarez* Court. According to the *Alvarez* dissent, a statute that criminalizes "only knowingly false statements about hard facts directly within a speaker's personal knowledge" "presents no threat to the freedom of speech." 567 U.S. at 739 (Alito, J., dissenting). Both the Access Provision and the Employment Provision criminalize "only knowingly false statements about hard facts directly within [the] speaker's personal knowledge." *See id.*; Iowa Code § 717A.3A(1)(a)-(b). Presumably, then, the three dissenters in *Alvarez* would have voted to uphold both the Access Provision and the Employment Provision in this case. And, again, for the reasons I explain in Sections II-III, the

*Alvarez* plurality's reasoning requires upholding both the Access Provision and the Employment Provision. So presumably the four justices in the plurality would also have voted to uphold both the Access Provision and the Employment Provision in this case. Thus, to resolve the case in the way that would have commanded the votes of five justices on the *Alvarez* Court, we would be required to uphold both the Access Provision and the Employment Provision.

In sum, our jurisprudence leaves open two approaches to resolving the difficult *Marks* problem that this case presents. But if I am right about how the *Alvarez* plurality's reasoning applies in this case, then the two approaches converge on the same result: we must uphold both the Access Provision and the Employment Provision. I devote the remainder of my opinion to explaining my view that the *Alvarez* plurality's reasoning implies that both the Access Provision and the Employment Provision are constitutional.

## II.

I begin with the Access Provision. The court concludes that the Access Provision does not violate the First Amendment under the *Alvarez* plurality's reasoning because trespass is a "legally cognizable harm." *See ante*, at 6-7; *Alvarez*, 567 U.S. at 719 (plurality opinion) (indicating that lies associated with a legally cognizable harm fall outside First Amendment protection). I agree. I write separately here to provide additional support for this conclusion.

A "legally cognizable harm," as the Supreme Court uses the phrase, is simply an injury that supports standing to pursue a cause of action. *See, e.g.*, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 578 (1992) (using the phrase "legally cognizable injury" to refer to an injury that supports standing); *Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 162 (2011) (Kagan, J., dissenting) (using the phrase "legally cognizable harm" to refer to an injury that supports standing). An injury that supports

standing under the law of one sovereign may not support standing under the law of another sovereign. *See Zicherman v. Korean Air Lines Co.*, 516 U.S. 217, 222-23 (1996) (noting differences between France and other nations regarding "what constitutes legally cognizable harm"). In addition, an injury that supports standing under the law of one sovereign at one time may not support standing under the law of that same sovereign at a different time. *See Spokeo, Inc. v. Robins*, 578 U.S. ---, 136 S. Ct. 1540, 1549 (2016) (explaining that "Congress may elevate to the status of legally cognizable injuries . . . injuries that were previously inadequate in [U.S.] law" (internal quotation marks and alterations omitted)). Therefore, the question what constitutes a legally cognizable harm cannot be answered except with respect to a particular legal sovereign at a particular time.

I would interpret the *Alvarez* plurality's use of "legally cognizable harm" as a reference to the kind of injury that supported standing under U.S. law when the First Amendment was ratified in 1791.[2] This interpretation is consistent with the Court's statement in *Nevada Commission on Ethics v. Carrigan* that "[l]aws punishing libel and obscenity are not thought to violate 'the freedom of speech' to which the First Amendment refers because such laws existed in 1791 and have been in place ever since." 564 U.S. 117, 122 (2011); *see also Alvarez*, 567 U.S. at 717 (plurality opinion) (limiting categories of unprotected speech to those "long familiar to the bar"); *Roth v. United States*, 354 U.S. 476, 482-83 (1957) (explaining the exclusion

---

[2]I recognize that "standing" was not a term of art in 1791. *See* Cass R. Sunstein, *Standing After* Lujan*? Of Citizen Suits, "Injuries," and Article III*, 91 Mich. L. Rev. 163, 169 (1992) (tracing the use of the term "standing" in the Article III context to a 1944 case). Nonetheless, evidence exists that "there was an active law of [what we would today call] standing in the eighteenth and nineteenth centuries." Ann Woolhandler & Caleb Nelson, *Does History Defeat Standing Doctrine?*, 102 Mich. L. Rev. 689, 691 (2004). Here, it is irrelevant to what extent this "law of standing," *id.*, went beyond the requirement of a cause of action. What matters is that trespass constituted an actionable injury at common law before 1791. *See, e.g.*, 3 William Blackstone, Commentaries *209 (recognizing trespass as a cause of action).

of obscenity and libel from First Amendment protection by reference to laws in place "[a]t the time of the adoption of the First Amendment").

Interpreting "legally cognizable harm" to refer to an injury that supported standing under U.S. law in 1791 is also consistent with the four examples that the *Alvarez* plurality offered of legally cognizable harms: defamation, fraud, invasion of privacy, and costs of vexatious litigation. 567 U.S. at 719. Although not dispositive, what was recognized as supporting standing to pursue a cause of action in law or equity in England prior to the American Revolution is probative of what would have been recognized as supporting standing to pursue a cause of action in U.S. federal court in 1791. *See Van Ness v. Pacard*, 27 U.S. (2 Pet.) 137, 144 (1829) (explaining that the colonists "brought with them [the] general principles" of English common law, even if they did not adopt every detail). And there is evidence that defamation, fraud, certain kinds of invasions of privacy, and vexatious litigation were all actionable in law or equity in England prior to the American Revolution. *See* King v. Lake (1670), 145 Eng. Rep. 552, 552-53; Hardres 470, 470 (treating libel as actionable); Chandelor v. Lopus (1603), 79 Eng. Rep. 3, 3-4; Cro. Jac. 4, 4 (clarifying the circumstances under which a plaintiff has a cause of action for "deceit"); Pope v. Curl (1741), 26 Eng. Rep. 608, 608; 2 Atk. 342, 342-43 (granting an injunction against the publication of private letters); Waterer v. Freeman (1640), 80 Eng. Rep. 412, 413; Hobart 266, 267 ("[I]f a man sue me in a proper Court, yet if his suit be utterly without ground of truth, and that certainly known to himself, I may have an action of the case against him for the undue vexation and damage that he putteth me unto by his ill practice.").

Finally, interpreting "legally cognizable harm" to refer to an injury that supported standing under U.S. law in 1791 makes the most sense out of the *Alvarez* plurality's willingness to place false speech associated with a legally cognizable harm outside First Amendment protection. It would make little sense for the Court to condition the scope of First Amendment rights on what confers standing in the courts

-18-

of the state whose government took the challenged action (in this case, Iowa) rather than on what confers standing under federal law. That would imply that two states could enact identical laws, one of which violates the First Amendment and the other of which does not. I doubt that the Court meant to allow this possibility. *See Virginia v. Moore*, 553 U.S. 164, 176 (2008) (rejecting the proposal to "link[] Fourth Amendment protections to state law" because it "would cause them to vary from place to place" (internal quotation marks omitted)). It would also make little sense for the Court to condition the scope of First Amendment rights on what contemporaneously supports standing under U.S. law rather than on what supported standing under U.S. law in 1791. That would imply that the scope of First Amendment protection contracts over time as Congress "elevate[s]" new harms to the status of legally cognizable harms for the purposes of federal law. *See Spokeo*, 136 S. Ct. at 1549. Worse, it would allow Congress to bootstrap laws into compliance with the First Amendment by elevating harms associated with the false speech that the laws regulate to the status of legally cognizable harms. Again, I doubt that the Court meant to allow this possibility. *See City of Boerne v. Flores*, 521 U.S. 507, 545 (1997) (O'Connor, J., dissenting) ("Congress lacks the ability independently to define or expand the scope of constitutional rights by statute."). The interpretation that makes the most sense out of the *Alvarez* plurality's use of the phrase "legally cognizable harm," then, is an interpretation that treats the phrase as a reference to an injury that supported standing under U.S. law when the First Amendment was ratified in 1791.

-19-

Here, there is no question that the speech the Access Provision prohibits is associated with an injury that supported standing under U.S. law in 1791. The Access Provision is a trespass law. *See* Restatement (Second) of Torts §§ 173, § 892B (Am. Law Inst. 1965). As a common-law cause of action, trespass existed before the ratification of the First Amendment. *See, e.g.*, *United States v. Jones*, 565 U.S. 400, 404-05 (2012) (citing *Entick v. Carrington*, 95 Eng. Rep. 807 (C.P. 1765) for the proposition that "[o]ur law holds the property of every man so sacred, that no man can set his foot upon his neighbour's close without his leave; if he does he is a trespasser, though he does no damage at all"); 3 William Blackstone, Commentaries *209 ("[T]he law of England . . . has treated every entry upon another's lands (unless by the owner's leave . . . ), as an injury or wrong, for satisfaction of which an action of trespass will lie . . . ."). The First Amendment was ratified against the backdrop of "[a] universal and long-established tradition of prohibiting" trespass, which "creates a strong presumption that the [Access Provision] is constitutional." *See Carrigan*, 564 U.S. at 122 (making this point about libel and obscenity). Thus, the false speech that the Access Provision criminalizes is associated with the kind of legally cognizable harm that, according to the *Alvarez* plurality, places it outside First Amendment protection. *See Alvarez*, 567 U.S. at 719.

### III.

I turn now to the Employment Provision. According to the *Alvarez* plurality, "[w]here false claims are made to effect a fraud or secure moneys or other valuable considerations, say offers of employment, it is well established that the Government may restrict speech without affronting the First Amendment." 567 U.S. at 723. Therefore, according to the plurality, if a person lies for the purpose of securing an offer of employment, then the lie is not protected by the First Amendment—even if the lie is unsuccessful because the employer does not hire the person or immaterial because the employer would have hired him anyway.

-20-

Here, the Employment Provision prohibits "willfully . . . mak[ing] a false statement or representation as part of an application or agreement to be employed at an agricultural production facility," if the speaker "knows the statement to be false" and "makes the statement with an intent to commit an act not authorized by the owner of the agricultural production facility, knowing that the act is not authorized." Iowa Code § 717A.3A(1)(b). The plain language of the *Alvarez* plurality opinion implies that the Employment Provision does not violate the First Amendment. *See Animal Legal Defense Fund v. Wasden*, 878 F.3d 1184, 1201-02 (9th Cir. 2018) (holding that a similar provision did not violate the free-speech clause of the First Amendment under the *Alvarez* plurality's rationale).

## IV.

In sum, the *Alvarez* plurality's reasoning implies that both the Access Provision and the Employment Provision are constitutional. Consequently, although our jurisprudence leaves open two ways of resolving the *Marks* question in this case, both ways converge on the same result: we must uphold both provisions.[3] Accordingly,

[3]The concurrence expresses concern about permitting the criminalization of false speech at a time "when a cloud of censorship appears to be descending, along with palpable public fear of being 'cancelled' for holding 'incorrect' views." *Ante*, at 11. But even under the *Alvarez* plurality's rule placing lies associated with a legally cognizable harm or made for material gain outside First Amendment protection, a statute criminalizing the expression of "incorrect" opinions on politically charged topics would be constitutionally problematic. By targeting politically incorrect views on a particular topic, the statute would draw a content-based distinction in addition to the distinction between truth and falsity. And this would trigger strict scrutiny (if not render the statute unconstitutional *per se*) even assuming the government could target a broader category of false speech without triggering any First Amendment scrutiny at all. *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 388 (1992) ("A State might choose to prohibit only that obscenity which is the most patently offensive *in its prurience—i.e.*, that which involves the most lascivious displays of sexual activity. But it may not prohibit, for example, only that obscenity which includes offensive *political* messages."); *cf. Alvarez*, 567 U.S. at 723 (making

I would reverse the district court's judgment in favor of the plaintiffs with respect to both the Access Provision and the Employment Provision.

_____

clear that the government may not "compile a list of *subjects* about which false statements are punishable" (emphasis added)). Here, neither the Access Provision nor the Employment Provision draws a further content-based distinction in addition to the distinction between truth and falsity. True, they target false speech used to obtain access to or employment at an agricultural production facility. But the fact that speech was used to obtain access to or employment at an agricultural production facility does not, by itself, entail anything about the content of the speech. Therefore, however legitimate the concurrence's concerns may be, I do not believe that they are implicated in this case.